## ENSLEY BANK & TRUST CO. v. UNITED STATES.

### No. 11465.

Circuit Court of Appeals, Fifth Circuit.
April 10, 1946.

Rehearing Denied May 15, 1946.

Bernard A. Monaghan and Lee C. Bradley, Jr., both of Birmingham, Ala., for appellant.

Homer R. Miller, Sp. Asst. to the Atty. Gen., and Sewall Key, Acting Asst. Atty. Gen., and William H. Burton, Jr., Asst. U. S. Atty., of Birmingham, Ala., for appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Ensley Bank & Trust Company, as taxpayer, made income tax returns on the actual receipts and disbursements basis, claiming in 1933 and 1934 deductions on account of a partial charge-off in each year as worthless of a note due by the defunct Ensley National Bank for an original principal of $355,080.63. The deductions were disallowed, additional taxes were assessed and paid, refund denied, and suit brought in the District Court to recover the additional taxes. The court allowed a recovery touching some matters, but held the Commissioner had not abused his discretion in disallowing the partial bad debt deductions. From this part of the judgment the taxpayer appeals.

A small item of $264 of income is also covered by the appeal, which arose from an error in bookkeeping in 1933, but it was developed in the argument that it ought to be income in either the year 1933 or 1934, and that the tax rate was the same for both years, so that it is immaterial in which year it should have been charged. We need not decide the question made concerning it.

As to the bad debt deductions, the Commissioner ruled thus: "The deduction claimed may not be allowed as a bad debt nor a loss, because there was not only no determination of worthlessness in 1933 and 1934, but also because the loss when determinable represents the cost of an asset and is not an ordinary and necessary expense of operating your business." It was never contended that a business expense is involved. But the appellee contends both that there was no debt, and no ascertainment of partial worthlessness; and that any loss was one incurred in purchasing the good will and other assets of the Ensley National Bank. The District Court appears to have held that the allowance of

partial bad debt deductions are discretionary with the Commissioner, and that no abuse of discretion was shown, and that general losses in the transaction with Ensley National Bank were not realized till that transaction was finally closed out in 1935, a year not here involved.

The transaction was this: Ensley National Bank, after a period of prosperity, became apparently insolvent in July, 1932, due to the depression in the steel business on which its customers and its business mostly depended. Stronger banks in Birmingham sought to prevent a failure which might also affect them, and the taxpayer, a State bank, was set up to take over the failing bank's affairs. This was done by an elaborate contract between the two banks made July 18, 1932, and later rewritten, whereunder the National Bank having arranged to go into voluntary liquidation appoints the State bank "to act as liquidating agent or trustee of National Bank", the liquidation to be under the supervision of the directors of the National Bank, and the agent being subject to removal but such removal not to impair the State bank's security in the assets, nor its right to collect compensation in dealing with the security, or interest upon the indebtedness of the National Bank arising under the contract. The State bank agrees to assume and pay off on demand all the debts and obligations of the National Bank, with a few exceptions. The National Bank agrees to pay the State bank the amount of all liabilities assumed or paid, and in addition to pay "either as compensation for services * * * or as interest on the amount of such indebtedness (at the election of the State bank from time to time) an amount equivalent to eight percent per annum thereon from the effective date of this agreement". The amount of the indebtedness is to be reduced by amounts realized by State bank in the liquidation, and shall be evidenced by note of the National Bank at the election of the State bank. The agreed interest or compensation shall be paid monthly, and computed upon the average daily balance of the liabilities of the National Bank not discharged by realizations out of the assets. The National Bank's obligation to repay the State bank is to mature after two years, but may be earlier called if necessary or desirable to file suit against National Bank's stockholders on their stockholders' liability. "National Bank hereby sells, assigns, transfers and sets over unto State bank its good will and banking business without any consideration therefor other than the execution by State bank of this agreement and the commencement of the performance of the duties devolving upon State bank". National Bank also assigns and transfers all cash and cash items to be applied to the indebtedness to State bank. Also to secure the payment of that indebtedness there is transferred, mortgaged, and pledged to State bank all of the assets, business and property of National Bank including property of every kind, except its franchise as a national bank and its membership in the Federal Reserve System. All necessary papers are to be executed, and full powers are given State bank to deal with and dispose of all the assets and property, but an executive officer of National Bank must consent to any compromise or release exceeding $500. All the National Bank's stockholders' liabilities are expressly preserved and to be made effective as may be necessary to repay State bank.

The indebtedness assumed and paid by State bank was promptly embodied in a note for $355,080.63, executed by the National Bank. Liquidation was not very successful, but payments on it (over and above the 8% retained for services or interest) reduced it by June 1, 1933, to $302,299.44. In July, 1934, the State bank demanded payment, but in vain, and stockholders of National Bank were assessed 100% on their stock, amounting to $200,000. About $35,000 was collected from them in 1934, and about $15,000 later. The State bank closed its affairs in 1935, there being ultimately a loss of the balance of the note, the amount not exactly appearing.

We are of opinion that there was a sale of a so-called good will, which the witnesses say actually was not thought of value at the time. The consideration expressed for it was the State bank's making and entering on the execution of its agreement. We do not think the State bank invested $355,000 in this good will, or any measurable sum whatever. It is true that it was a capital asset, and that any gain or loss on it was not realized till it was disposed of in 1935. But we hold that its acquisition under the circumstances does not prevent the note from being a debt.

There was therefore a large note, secured by a transfer of assets of greater face value, but which, as all the witnesses

970

say, probably would not pay off the note. There were also the stockholders' liabilities, of face value of $200,000, but which ultimately yielded only $50,000. This note eventually proved uncollectible in 1935, and a charge of it off as a bad debt then might, we assume, have been had. Prior to 1921, bad debts could only be charged off as a whole on the final ascertainment of their worthlessness. Section 23(j) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 490, and Section 23(k) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 673, which govern these tax years, are identical, and contain the added provision: "And when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt in an amount not in excess of the part charged off within the taxable year, as a deduction." This language is on its face permissive, and it has been held to vest a discretion in the Commissioner to allow or withhold a partial deduction. Stranahan v. Commissioner, 6 Cir., 42 F.2d 729; Commissioner v. Liberty Bank & Trust Co., 6 Cir., 59 F.2d 320; Olympia Harbor Lumber Co. v. Commissioner, 9 Cir., 79 F.2d 394. But it has also been held that if the evidence of partial uncollectibility is clear, he abuses his discretion if he refuses the deduction. Ross v. Commissioner, 7 Cir., 72 F.2d 122. We need not closely scrutinize the law, because we think the uncollectibility of the charge-off of about $9,000 in 1933, and again in 1934, is not shown to have been clearly apparent at the time. Appellant argues that it was practically certain in both years that the note could not be paid out of the transferred assets, and the witnesses so say; and that when appellant took money from the proceeds of the liquidation each year for its own compensation or interest (creating taxable income for itself) the secured debt was rendered certainly by that much less collectible; and the charge-offs are in each year less than the takings as compensation. The argument would have force, except that the debt was also secured by the stockholders' liabilities of $200,000. The witnesses say they did not estimate or consider these. In 1933 no effort had been made to appraise or enforce them. Yet in 1934 $35,000 was actually collected from them. The evidence does not show that it was clearly apparent either in 1933 or 1934 that the transferred assets plus the stockholders' liabilities would not eventually pay the note. A case is not made that the Commissioner arbitrarily refused a partial

bad debt deduction to which in the tax years in question the taxpayer was entitled.

Judgment affirmed.