*STATE FISH CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1042–65. Filed June 28, 1967.

*Eugene J. Steiner,* for the petitioner.
*Lawrence J. Shongut,* for the respondent.

FORRESTER, *Judge:* Respondent has determined an income tax deficiency in the amount of $3,100.50 for petitioner's fiscal year ended September 30, 1960. The only issue is whether $12,250 received by petitioner on July 22, 1960, in settlement of a judgment in its favor is a return of capital or is ordinary income. In his deficiency notice, respondent determined the gross amount received to be $13,295.63, but has since conceded that the correct figure is $12,250.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

The petitioner is a New York corporation whose principal office and place of business has been in Kingston, N.Y., at all relevant times. It timely filed its income tax return for its fiscal year ended September 30, 1960, with the district director of internal revenue, Albany, N.Y.

On October 1, 1954, George M. and Stella Jacobson, husband and wife, entered into a written agreement with Emil Lambiase (sometimes hereinafter referred to as Emil) which provided that the Jacob-

---

*Opinion modified. Supplemental Opinion appears at 49 T.C. 13.

sons receive all of the assets (other than inventory, accounts receivable, or accounts payable) of the State Fish Co. in return for $25,000. Said agreement is reproduced in full in the footnote.[1] The inventory, consisting of various types of fish was transferred under a separate agreement, for $2,997.07.

After acquiring it, the Jacobsons originally operated State Fish Co. as a partnership. In the opening entry of the general journal of the partnership they allocated the $25,000 purchase price among the assets received as follows:

| | |
|---|---:|
| One 1952 Chevolet truck with body | $4,000 |
| One 1950 Chevrolet truck, panel | 2,000 |
| Miscellaneous tools and equipment | 1,000 |
| Goodwill | 18,000 |
| Total | 25,000 |

---

[1] KNOW ALL MEN BY THESE PRESENTS,

THAT, EMIL LAMBIASE, d.b.a. STATE FISH CO., Kingston, New York, party of the first part, for and in consideration of the sum of Twenty-five Thousand ($25,000) Dollars, lawful money of the United States, to him in hand paid, at or before the ensealing and delivery of these presents by GEORGE M. JACOBSON and STELLA JACOBSON, his wife, of Stamford, New York, parties of the second part, the receipt whereof is hereby acknowledged, has bargained and sold, and by these presents does grant and convey unto the said parties of the second part, their executors, administrators, successors and assigns all of the property mentioned and described in Schedule "A" annexed hereto and made a part hereof,

To HAVE AND TO HOLD the same unto the said parties of the second part, their executors, administrators, successors and assigns forever AND he does for his heirs, executors and administrators, covenant and agree, to and with the said parties of the second part, to warrant and defend the sale of the aforesaid equipment, merchandise, good will and use of trade name, hereby sold unto the said parties of the second part, their executors, administrators, successors and assigns, against all and every person and persons whomsoever.

AND HE DOES FURTHER COVENANT that he will not re-establish, re-open, be engaged in, solicit, nor in any manner whatsoever become interested in, directly or indirectly either as employee, as partner or agent, or as stockholder, director or officer of a corporation, or otherwise in any business, trade or occupation similar to the one hereby sold, which includes the sale or distribution of sea food, fresh or frozen fish of all kinds, and frozen foods, within a radius of 50 miles of the City of Kingston for a period of five years from the date of the transfer of this business.

IN WITNESS WHEREOF, the party of the first part has set his hand and seal this 1st day of October, 1954.

Signed, sealed and delivered in the presence of:

(S) [Illegible]                                     (S)  EMIL LAMBIASE
                                                         d.b.a. *State Fish Co.*

SCHEDULE A

One Chevrolet panel truck, Serial No. 2HSD–1903, Motor No. HCM83003 complete.

One Chevrolet panel truck, Serial No. 2VYC–1656, Motor No. KEM89101 Model No. 6503, complete.

All of his right title and interest in and to the business known as the State Fish Co., formerly conducted by the undersigned.

The use of the trade name "State Fish Co." which the seller hereby agrees to relinquish by the filing of a certificate of discontinuance in the County Clerk's Office of Ulster County, New York.

The use of the telephone number 3585, now used as the number and designation of the State Fish Co.

                                                    (S)  EMIL LAMBIASE
                                                         d.b.a. *State Fish Co.*

At the time of sale, the Jacobsons received documents in the form of sales invoices which indicated that Emil had originally paid $2,767.96 for the 1952 Chevrolet and $1,954.20 for the 1950 Chevrolet. The fair market values of the trucks, the tools, and equipment so included in the journal entry were no larger than the amounts shown, and at least $18,000 was paid for the goodwill.

Shortly after the Jacobsons went into the above fish business, Emil offered them $40,000 to sell it back to him. The Jacobsons refused the offer. He approached the Jacobsons again 6 months later to attempt to buy back the business and was again turned down. Sometime thereafter Carl Rhode informed the Jacobsons that Louis Lambiase was going into the fish business with Don Swan and that Emil was providing the backing.

On or about July 16, 1956, the Jacobsons commenced an action against Emil in New York Supreme Court, Ulster County. Their complaint charged that he was attempting to reinvest himself with the goodwill of State Fish and had solicited his former customers, and also new customers of State Fish and had persuaded a number of them to switch their business to him. It alleged further that he had engaged in price-cutting competition with the Jacobsons which resulted in a reduced margin of profit on sales, and prayed for $40,000 damages and an injunction enforcing the covenant not to compete for the agreed term. The complaint is reproduced in its entirety in the footnote.[2]

---

[2]

STATE OF NEW YORK

Supreme Court: Ulster County

GEORGE M. JACOBSON and STELLA JACOBSON, *Plaintiffs*

AGAINST

EMIL LAMBIASE, *Defendant*

The plaintiffs for their complaint herein, by their attorney, N. LeVan Haver, respectfully show to the Court and allege:

I

That since the 1st day of October, 1954 the plaintiffs have been and still are engaged in the sale and distribution of sea food, fresh and frozen fish of all kinds, and frozen foods, in the City of Kingston, Ulster County, New York, operating said business under the name and style of "State Fish Co."

II

Upon information and belief that prior to said date, the defendant was the owner, engaged and employed in said business, and conducted said business in the City of Kingston, New York, under the name and style of "State Fish Co."

III

Upon information and belief that the business formerly conducted by the defendant under the name and style of "State Fish Co." was owned and operated by the defendant for a number of years prior to the 1st day of October, 1954 and during that time had established a good reputation for the quality of the products sold in said business and

A jury trial was had, and on June 23, 1960, the Jacobsons were awarded a judgment against Emil for $10,000 together with interest on said sum in the amount of $2,835, and $460.63 for costs and dis-

had established a large and profitable business in and about the said City of Kingston, the County of Ulster and surrounding territory.

### IV

Upon information and belief that in the operation of said business, the defendant had obtained a large number of permanent customers for the sale of his products and that the business of said customers had a large commercial value and constituted the major portion of the good will of the business of said "State Fish Co." upon the 1st day of October, 1954.

### V

Upon information and belief, that the defendant prior to the 1st day of October, 1954 was actively engaged in the operation of said business, hired and supervised employees thereof, purchased the products sold by said business, paid its liabilities and debts, and solicited customers therefor; and that he thereby acquired and still has an intimate acquaintance with the customers of said business as of the time of transfer and sale thereof to the plaintiffs as herein alleged.

### VI

That on or about the 1st day of October, 1954, the defendant, in consideration of the sum of Twenty-five thousand ($25,000) Dollars, to him paid by the plaintiffs herein, sold and transferred to the plaintiffs all of his right, title, and interest in and to the business known as the "State Fish Co.", the use of the trade name, telephone number and motor vehicles used in the operation of said business; and by so doing, also transferred to the plaintiffs the good will of said business; that the inducement to purchase said good will from the defendant by the plaintiffs was the large number of customers theretofore served by the defendant and who would continue to deal with the plaintiffs operating the business under the same name of "State Fish Co."

### VII

That plaintiffs, in reliance upon such inducements, purchased the property, trade name and good will, as aforesaid.

### VIII

That as a part of the Bill of Sale by which such transfer was effected, and as a portion of the purchase price paid therefor, the defendant covenanted and agreed to and with the plaintiffs that he would not re-establish, re-open, be engaged in, solicit, nor in any manner whatsoever become interested in, directly or indirectly either as employee, as partner or agent, or as stockholder, director or officer of a corporation, or otherwise in any business, trade or occupation similar to the one sold by the defendant to the plaintiffs, including the sale or distribution of sea food, fresh or frozen fish of all kinds and frozen food within a radius of fifty (50) miles of the City of Kingston, for a period of five years from date of said instrument. Annexed hereto and marked "Exhibit A" is a true copy of the Bill of Sale effecting the transfer of said business.

### IX

That the purchase price of said property was greatly in excess of the value of all of the tangible personal property described in said Bill of Sale, the tangible personal property consisting only of the vehicles transferred thereby, so that substantially all of the actual purchase price was paid for the good will of said business, consisting of the customers served by it and the name under which it had been operated, together with the agreement by the defendant not to compete in a similar business.

### X

That as a part of said sale, the defendant also transferred to the plaintiffs its stock of goods on hand for re-sale, for which the plaintiffs paid a separate and distinct consideration of Two Thousand, Nine Hundred ninety-seven and 09/100 ($2,997.09) Dollars, representing the value of said inventory.

### XI

Upon information and belief, that the defendant, notwithstanding the transfer made by him of said business and the good will thereof, and his covenant and agreement not

bursements; a total of $13,295.63. The judgment was subsequently settled and satisfied on payment of $12,250 during the year in issue. During the trial of the above action in the New York Supreme Court,

to engage in or become interested in any similar business, as heretofore stated, maliciously, wrongfully, and with the intent to injure and destroy the benefits obtained by said plaintiffs under the transfer herein set forth, and with the direct purpose of inducing the customers aforesaid to cease their dealings with the plaintiffs, became interested in the operation of another business, similarly engaged, in the City of Kingston, Ulster County, New York and surrounding territory in the sale and distribution of sea food, fresh or frozen fish of all kinds and frozen foods, and that the defendant is still engaged in the conduct of such business.

### XII

That by reason thereof, the defendant is now seeking to re-invest himself with the good will of the business of the plaintiffs so purchased by them from the defendant, and that in the execution of such purpose and intention, the defendant is soliciting the former customers of said business known as the "State Fish Co.", in the City of Kingston and surrounding territory within a radius of fifty (50) miles thereof.

### XIII

Upon information and belief, that the business in which the defendant is now interested is similar in every respect to the business transferred by the defendant to the plaintiffs and is a business which the defendant, upon such transfer, covenanted and agreed not to engage or be interested in; and that the defendant has succeeded in persuading a number of the former customers of the business operated by the plaintiffs under the name and style of "State Fish Co." to cease doing business with the plaintiffs and to do business with the defendant, in direct violation of said covenant.

### XIV

Upon information and belief, that the customers, induced by the defendant to cease doing business with the plaintiffs and to do business with him, consisted not only of customers who did business with the defendant prior to October 1, 1954, but also new customers obtained by the plaintiffs since the transfer of said business to them.

### XV

That the new concern in which the defendant has become interested has offered fish and kindred merchandise for sale at prices lower than prices for which plaintiffs were selling the same merchandise, and the plaintiffs have been compelled to cut prices in order to retain certain customers solicited by the new concern, and by reason of the premises plaintiffs have been compelled to reduce prices of their products to all their clientele thus reducing their margin of profit to their further damage.

### XVI

Upon information and belief that the defendant is still endeavoring to solicit other customers of the plaintiffs to cease doing business with them and to do business with the defendant, in violation of said covenant and agreement.

### XVII

That the plaintiffs have in every respect duly performed all of the conditions and covenants on their part to be performed.

### XVIII

That the breach and violations of the covenant and agreement by the defendant were without the consent or acquiescence of the plaintiffs and are continuing notwithstanding the protests of the plaintiffs to such actions.

### XIX

That by such actions of the defendant, the plaintiffs have been and are continuing to be irreparably injured and that the plaintiffs have no adequate remedy at law.

### XX

That by reason of said actions the plaintiffs have been damaged to date in the sum of Forty Thousand ($40,000) Dollars.

evidence was introduced which tended to substantiate all the charges made in the complaint.

In 1958, while the above action against Emil was pending, the Jacobsons transferred all of the assets of their partnership to the petitioner, which they controlled, and received its stock in exchange. Among the assets so transferred was the $18,000 amount they had paid for and attributed to the goodwill of the business when it was first purchased from Emil, and also such damages as might be recovered in their action against him. The goodwill item had been carried at $18,000 during the life of the partnership and was transferred at that amount to, and so carried upon, the books of the petitioner.

When the Jacobsons received the $12,250 settlement, they deposited it in the State of New York National Bank, Kingston, N.Y., to the credit of petitioner. Petitioner then proceeded to pay the attorney in the case, N. LeVan Haver, a fee of $2,500. On its books, petitioner reflected the receipt of the settlement by crediting goodwill for $9,750.[3]

In his deficiency notice, respondent added the entire $13,295.63 judgment to petitioner's taxable income for the year ended September 30, 1960, and allowed the $4,960.63 court costs and legal fees incurred in connection with the litigation as deductions. As was previously stated, respondent now concedes that the gross amount received was $12,250.

ULTIMATE FINDINGS OF FACT

Prior to the receipt of the settlement from Emil, petitioner's cost basis in its goodwill was at least $18,000.

WHEREFORE, Plaintiffs demand judgment as follows:

1. Judgment restraining the defendant, his agents and servants from in any manner continuing, engaging, becoming interested or employed in, directly or indirectly, as employee, partner or agent or as stockholder, director or officer in a corporation, or otherwise in any business which would wholly or partly include the sale or distribution of sea food, fresh or frozen fish of all kinds and frozen foods, within a radius of fifty (50) miles of the City of Kingston, for a period of five years from the 1st day of October, 1954; and also from injuring, impairing or destroying the good will transferred by the defendant to the plaintiffs and from soliciting or interfering directly or indirectly with customers dealing with the plaintiffs; and also enjoining and restraining the defendant, his agents and servants from infringing upon the rights of said plaintiffs under the instrument of transfer herein set forth for the period and within the area above stated.

2. That during the pendency of this action, a temporary injunction of like tenure and effect be granted and that the defendant be stayed, enjoined and restrained during the pendency of this action from committing any of the acts complained of as aforesaid.

3. Damages against the defendant in the sum of Forty Thousand ($40,000) Dollars.

4. Such other and further relief as to the Court may seem just and proper and which may be consistent with equity and good conscience, together with the costs and disbursements of this action.

[3] Two thousand dollars had previously been paid to N. LeVan Haver as a retainer. The corporation neglected deducting this amount from the gross recovery, but respondent has allowed the total fee of $4,500 and court costs of $460.63 as proper deductions from the gross amount received as a result of the lawsuit.

The $12,250 settlement is allocable as follows:

| | | |
|---|---|---|
| I Damage to goodwill | $9,213.56 | |
| Reimbursement for court costs and disbursements as to I | 331.04 | |
| | | $9,544.60 |
| II Interest | 2,612.04 | |
| Reimbursement for court costs and disbursements as to II | 93.36 | |
| | | 2,705.40 |
| Total | | 12,250.00 |

The $4,960.63 legal fees and court costs were incurred for the following purposes:

| | |
|---|---|
| For damage to goodwill (78 percent) | $3,869.29 |
| For recovery of interest (22 percent) | 1,091.34 |
| Total | 4,960.63 |

OPINION

At issue is the tax treatment of the receipt by petitioner of the $12,250 settlement of the judgment on the action for breach of the covenant not to compete.

The judgment of the New York Supreme Court provided for a total award of $13,295.63 to be made up of the $10,000 jury verdict, $2,835 interest, and $460.63 plaintiff's costs. It is a reasonable conclusion that the $12,250 settlement represents a proportionate adjustment of all three of these items, and we so hold. *Glenshaw Glass Co.*, 18 T.C. 860 (1952), affd. 211 F. 2d 928 (C.A. 3, 1954), reversed on another issue 348 U.S. 426 (1955); *Telefilm, Inc.*, 21 T.C. 688 (C.A. 9, 1954), reversed on other grounds (55-1 U.S.T.C. par. 9453 (C.A. 9, 1955), an unreported case.). Since the items comprising the $12,250 settlement have different tax consequences, we will discuss them individually.

*Interest*

The judgment provided for interest on the $10,000 award to accrue from October 1, 1955, the approximate date on which Emil breached his covenant. Petitioner does not seriously dispute the proposition that this interest is taxable as ordinary income and it is clear that it is, for this interest is in lieu of the earnings which the corporation would have realized from the use of the money if Emil had recompensed it for damages when the covenant was breached. Cf. *Dirks* v. *Hillcone*

*Steamship Company*, 201 N.Y. Supp. 2d 229 (1960). Consequently, $2,612.04, which we have allocated to interest out of the total settlement of $12,250, is ordinary income to petitioner. *Commissioner* v. *Kieselbach*, 127 F. 2d 359 (C.A. 3, 1942), affd. 317 U.S. 399 (1943); *Spangler* v. *Commissioner*, 323 F. 2d 913 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *Ollie Beverly Rose*, 8 T.C. 854 (1947).

The portion ($93.36) of the court costs which we have allocated to the recovery of this interest is not taxable to petitioner since this was simply reimbursing it for a prorata part of costs which had been paid.

Respondent allowed the entire $4,960.63 court costs and legal fees incurred in connection with the litigation as deductions but this allowance was made on the theory that the entire recovery was taxable income in petitioner's hands. Since we have allocated 22 percent or $1,091.34 of these costs and fees to the recovery of taxable interest, it is clear that such amount is allowable as a deduction. *Spangler* v. *Commissioner, supra; E. J. Murray*, 21 T.C. 1049 (1954), affd. 232 F. 2d 742 (C.A. 9, 1956). The net amount of interest taxable to petitioner in the year of issue therefore is $1,520.70.

## Damages Resulting from Breach of the Covenant

The parties are in accord that classification of amounts received in settlement of litigation or of a judgment is to be determined by the nature of the action which has been settled and we agree that this is a correct statement of the law. As stated in *Spangler* v. *Commissioner, supra* at 916:

In determining whether receipts are taxable as ordinary income or return of capital it is immaterial whether taxpayer effected collection amicably or by resolving a dispute through compromise or litigation. It is the nature of the underlying claim that controls and not the manner of collection.[4] [Footnote omitted.]

*Ralph Freeman*, 33 T.C. 323 (1959); *Telefilm, Inc., supra; Chalmers Cullins*, 24 T.C. 322 (1955); *United States* v. *Safety Car Heating Co.*, 297 U.S. 88 (1936); and as stated in *Raytheon Production Corp.* v. *Commissioner*, 144 F. 2d 110, 113 (C.A. 1, 1944), certiorari denied 323 U.S. 779, affirming 1 T.C. 952: "the question to be asked is 'In lieu of what were the damages awarded?' * * * [Citing cases]."

The petitioner agrees that a judgment or a settlement to recompense for lost profits is taxable. *Carter's Estate* v. *Commissioner*, 298 F. 2d 192 (C.A. 8, 1962), affirming 35 T.C. 326; *Chalmers Cullins, supra*, and respondent admits that a judgment or settlement to recompense for injury or damage to goodwill is a return of capital and taxable only to the extent it exceeds the basis of the goodwill. *Raytheon Production Corp.* v. *Commissioner, supra; Telefilm, Inc., supra; Sager Glove Corporation*, 36 T.C. 1173 (1961), affd. 311 F. 2d 210

(C.A. 7, 1962), certiorari denied 373 U.S. 910; *Glenshaw Glass Co.*, *supra*. We agree with the concessions of both parties. Such propositions are stated in *Sager Glove Corporation, supra* at 1180, as follows:

The taxability of the proceeds of a lawsuit, or of a sum received in settlement thereof, depends upon the nature of the claim and the actual basis of recovery. If the recovery represents damages for lost profits, it is taxable as ordinary income. However, if it represents a replacement of capital destroyed or injured, the money received, to the extent it does not exceed the basis, is a return of capital and not taxable. * * * [Citing cases.]

It is clear from the above that we must decide the threshold question of petitioner's basis in its goodwill in the instant case because the portion of the settlement representing a replacement of destroyed or injured goodwill (capital) is taxable only to the extent it exceeds petitioner's basis in the goodwill.

Considering all of the facts of record we have found such basis to be $18,000.

The form of the sales agreement of October 1, 1954, specifically allocates the entire $25,000 consideration to the properties mentioned in a schedule which included two trucks, "the business," the use of the trade name, and the use of the telephone number. The record shows that "the business" which was conveyed was meant to and did include a list of Emil's customers. In the last paragraph of the sales agreement Emil covenanted not to compete within a radius of 50 miles and for a period of 5 years. No consideration was specifically assigned for the covenant.

George Jacobson testified to the importance of the going value or goodwill of the business and stated that $18,000 of the total consideration paid was for the goodwill. His testimony is supported by the partnership's opening entry in its general journal and by the fact that no part of this $18,000 was depreciated by the Jacobsons over the 5-year term of the covenant but was transferred by them, undiminished, to the corporate petitioner in 1958 and thereafter so carried undepreciated upon petitioner's books.

In *Aaron Michaels*, 12 T.C. 17 (1949), we said:

If such an agreement [a covenant not to compete] can be segregated, not so much for purposes of valuation as in order to be assured that a separate item has actually been dealt with, the [amount paid for the] agreement is ordinary income and not the sale of a capital asset. *Estate of Mildred K. Hyde*, 42 B.T.A. 738. But where it accompanies the transfer of good will in the sale of a going business and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which he has acquired, the covenant is regarded as nonseverable and as being in effect a contributing element to the assets transferred. *Toledo Newspaper Co.*, 2 T.C. 794; *Toledo Blade Co.*, 11 T.C. 1079.

We believe that Emil's covenant not to compete which accompanied the transfer of goodwill in the instant case was taken solely to insure

the beneficial enjoyment of that goodwill and was therefore non-severable and we so hold. It follows that the Jacobsons' basis in the goodwill was $18,000 and under the provisions of section 362(a) of the 1954 Code,[4] the petitioner's basis in such goodwill was also $18,000.

This brings us to the central question in the instant case, viz, for what was the $12,250 settlement of the judgment paid. As we have already indicated, $2,612.04 of this amount was paid as interest and $424.40 was paid as reimbursement for costs and disbursements. Thus, $9,213.56 was paid in settlement of the remainder ($10,000) of the judgment against Emil, and the character of the payment is derivative and depends upon the character of the judgment itself. *Telefilm, Inc., supra; Ralph Freeman, supra; Spangler* v. *Commissioner, supra; Raytheon Production Corp.* v. *Commissioner, supra; Chalmers Cullins, supra; United States* v. *Safety Car Heating Co., supra.*

It is respondent's position that the evidence of record shows that the suit against Emil was for damages as a result of lost profits which would have been taxable and that therefore such damages are also taxable. *Chalmers Cullins, supra; Carter's Estate* v. *Commissioner, supra.* It is petitioner's position that this entire portion of the settlement represented damage to the goodwill and was therefore a return of capital (not exceeding basis) and nontaxable. Neither the jury verdict nor the judgment attached any label to, or made any allocation of, this $10,000 amount which was settled for $9,213.56.

The parties agree that the suit against Emil was based upon his breach of the covenant not to compete. It is obvious that the breach of the covenant in the circumstances of this case could result in either a loss of profits or in damage to and diminution of the goodwill or partly in both, and it is at this point that the parties are in disagreement.

The decided cases seem to be unanimous in holding that in such circumstances as we have here, the nature of the recovery is to be determined from the claims made in the pleadings or complaint filed in the prior action and the issues and evidence there presented to the jury. *Raytheon Production Corp.* v. *Commissioner*, 144 F. 2d 110, 113 (C.A. 1, 1944), certiorari denied 323 U.S. 779, affirming 1 T.C. 952, and cases there cited; *Telefilm, Inc., supra; Commissioner* v. *Murdoch*, 318 F. 2d 414 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court.

Employing this method we have carefully examined the complaint in the Jacobsons' action against Emil in the New York Supreme Court and have concluded that 10 of its 24 numbered paragraphs are directly concerned with damage to the goodwill of the business while only one such paragraph is directly concerned with lost profits. The

---

[4] All references are to the Internal Revenue Code of 1954.

remaining paragraphs are concerned with background material, allegations of fact, and prayers.

At the trial herein, three persons testified as to the issues involved in, and the evidence presented at, the prior trial. George M. and Stella Jacobson, testifying on behalf of petitioner, asserted that no claim for lost profits as such was ever contemplated, asserted or supported by any evidence and that the entire prior trial was concerned solely with damage to the goodwill of the business; that the evidence there clearly showed Emil's breach of the covenant and that he had succeeded in getting about 50 customers away from the Jacobsons, including some new customers acquired by them after purchasing the business on October 1, 1954, all to the damage to, and diminution in value of the goodwill of their business.

Edward J. McDonough, the attorney who had represented Emil in the prior trial and who was present in court during that trial, was called as a witness herein by the respondent. He testified that the main issue in the prior trial was whether or not Emil had violated the covenant and that the other two elements there were loss of goodwill and loss of profits. McDonough revealed that Emil introduced no evidence at the prior trial but that the Jacobsons' evidence showed that Emil had been able to get back as customers many Catholics and Catholic institutions included on the customers' list acquired by the Jacobsons. McDonough also testified as follows:

Q. Were you in Court when Mr. Haver summed up, Mr. McDonough?

A. I was, sir.

Q. What points did he make in his summation?

A. I couldn't give you the points he made in his summation.

Q. Did he discuss the impairment of the good will previously purchased by the plaintiffs?

A. He did.

   *       *       *       *       *       *       *

Q. Do you recall his comments to the effect that the loss of customers had contributed largely to the impairment of this good will?

A. I will go along with that.

Q. And as a lawyer who has practiced for 29 years, you know the meaning, generally, of good will, do you not?

A. I think I do.

Q. And when good will is acquired it represents, does it not, a list of customers who have been in the habit of frequenting that particular business?

A. Quite right, sir.

Q. So that if, in the event customers are lost by reason of a breach of a covenant on the part of the seller not to compete for a period of five years within a radius of fifty miles, would that be an impairment of good will?

A. I would say so.

It is petitioner's position that any proof of lost profits at the prior trial was merely and solely to assist that court and jury in computing

damage to the goodwill and not as an independent basis to recovery. Having carefully considered the entire record we agree with petitioner.

In *Farmers' and Merchants' Bank* v. *Commissioner*, 59 F. 2d 912 (C.A. 6, 1932),[5] the facts were that the petitioner bank, which was not a member of the Federal Reserve system, habitually made a charge for the collection of checks on foreign banks and of checks drawn on it and sent from other banks. The Reserve Bank demanded that petitioner clear such checks at par, which demand was refused, whereupon the Reserve Bank notified its members that it would collect without charge all checks drawn on petitioner. The method of the Reserve Bank was to have its agents appear at petitioner's banking house daily and demand payment in cash. Petitioner asserted that these collections were being made in such an unusual and unbusinesslike manner as to attract unfavorable public comment and claimed that it was being annoyed, embarrassed, and interfered with in the conduct of its affairs. Petitioner brought an action for damages against the Reserve Bank alleging that by reason of its wrongful conduct petitioner had been forced to keep unusually large amounts of money in its vault losing the earnings thereon, that it had lost deposits and failed to gain new depositors, had been unable to develop new business and had been permanently injured in its reputation, standing, growth, and prosperity. Such action was compromised and settled by the Reserve Bank's payment of a lump sum to petitioner which sum was contended by respondent to represent lost earnings and therefore to be includable in petitioner's net income. Although it is obvious that petitioner's complaint had alleged both loss of earnings and damage to reputation (goodwill) the court decided the case in petitioner's favor, saying at 913:

The fund involved must be considered in the light of the claim from which it was realized and which is reflected in the petition filed * * *

We think that the gravamen of petitioner's action against the Reserve Bank was the injury inflicted to its banking business generally, and that the true measure of damages was compensation to be determined by ascertaining how much less valuable its business was by reason of the wrongful acts of the Reserve Bank. * * * [Citing cases] * * * *Profits were one of the chief indications of the worth of the business; but the usual earnings before the injury, as compared with those afterward, were only an evidential factor in determining actual loss and not an independent basis for recovery.* [Emphasis supplied.]

Comparisons of the complaint in the Jacobsons' action against Emil and the evidence there presented to the jury with the facts and the petition filed in *Farmers' and Merchants' Bank* v. *Commissioner, supra*, lead us to the conclusion that the instant case is the stronger of the two

---

[5] Reversing 20 B.T.A. 622 (1930), but thereafter cited with approval by us in *Edward H. Clark*, 40 B.T.A. 333 (1939), and *Highland Farms Corporation*, 42 B.T.A. 1314 (1940).

for the proposition that the element of lost profits was not an independent basis for recovery but only an evidential factor in determining actual damage to and diminution of goodwill. See also *Raytheon Production Corp.* v. *Commissioner, supra,* where the court stated at 113:

The allegations and evidence as to the amount of profits were necessary in order to establish the value of the goodwill and business since that is derived by a capitalization of profits. * * *

Also cf. *Edward H. Clark,* 40 B.T.A. 333 (1939); *Highland Farms Corporation,* 42 B.T.A. 1314 (1940) (issue 3); *Henri Chouteau,* 22 B.T.A. 850 (1931) (issue 2); and *Inaja Land Co., Ltd.,* 9 T.C. 727 (1947).

The respondent argues in support of his position that since only $18,000 was paid for the goodwill and the complaint in the Jacobsons' action against Emil asserted, *inter alia,* damages in the amount of $40,000, that it necessarily follows that most of the amount prayed was for lost profits. We point out first that the fair market value and the basis of goodwill like any other asset, are two entirely different things, and second, that in so arguing the respondent has overlooked or chosen to ignore the undisputed evidence (from which we have found as a fact) that Emil had on two occasions offered to repurchase the business from the Jacobsons for $40,000. This indicates, of course, that Emil thought he had made a bad deal in selling to the Jacobsons for $25,000 and was willing to sweeten the pot to get the business back, and failing in this he tried the other approach of breaching his covenant. The petitioner and the Jacobsons have always valued the goodwill at the $18,000 which was paid for it, but the above evidence would indicate either that their valuation was too low or that they had succeeded in increasing the value of the goodwill before Emil's offers were made.

We conclude from the entire record that this entire $9,213.56 portion of the settlement represented damage to the goodwill and diminution of its value and since this amount did not exceed petitioner's basis that it is not taxable. The portion of the reimbursement for court costs and disbursements ($331.04) which we have allocated to this part of the recovery is also not taxable to petitioner since it was reimbursing it for a prorata part of the costs which had been paid, and the portion of the legal fees and court costs which we have allocated to this element of the recovery (78 percent or $3,869.29) is not deductible by petitioner but was a capital expenditure made to recover and defend the goodwill and is therefore to be so capitalized, *Spangler* v. *Commissioner, supra* at 919.

*Decision will be entered under Rule 50.*