INCO ELECTROENERGY CORPORATION, SUCCESSOR IN INTEREST TO ESB INCORPORATED & CONSOLIDATED SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; INCO ALLOYS INTERNATIONAL, INC. (FORMERLY HUNTINGTON ALLOYS, INC. AND FORMERLY INTERNATIONAL NICKEL COMPANY, INC.), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Inco Electroenergy Corp. v. Commissioner
Docket Nos. 29491-84; 934-86.
United States Tax Court
T.C. Memo 1987-437; 1987 Tax Ct. Memo LEXIS 434; 54 T.C.M. (CCH) 359; T.C.M. (RIA) 87437; August 31, 1987. *434 Dennis I. Meyer, and C. David Swenson, for the petitioner. Alan E. Cobb, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable
Petitioner
Year Ended
Deficiency
Inco Electroenergy Corporation
March 31, 1970
$ 114,617.00
March 31, 1971
25,942.00
March 31, 1972
28,173.00
March 31, 1973
23,317.00
March 31, 1974
762,234.00
Inco Alloys International, Inc.
December 31, 1974
58,994.34
After concessions, the only remaining issue is whether the proceeds received by ESB Incorporated, a predecessor to both petitioners, from a settlement agreement with EXXON Corporation constituted capital gain or ordinary income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. [1] The stipulation of facts and exhibits associated therewith are incorporated herein by reference. Petitioner in docket No. 29491-84, Inco Electroenergy Corporation, a Pennsylvania corporation, *435 had its principal office in New York at the time it filed its petition. Petitioner in docket No. 934-86, Inco Alloys International, Inc., a Delaware corporation had its principal office in West Virginia at the time it filed its petition. On brief both parties have indicated that all issues in docket No. 934-86 have been disposed of by agreement. Consequently, hereinafter the word petitioner in the singular shall refer only to Inco Electroenergy Corporation unless otherwise indicated. Both petitioners are successive successors-in-interest to ESB Incorporated (ESB) and its consolidated subsidiaries. ESB was originally organized as Electric Storage Battery Company under the laws of the State of New Jersey in 1988. In 1967, Electric Storage Battery Company changed its name to ESB Incorporated. [2] Throughout its history the company has been continuously engaged in the manufacturing business. Its products include storage batteries and related accessories. In 1901, ESB adopted and began using the trademark "EXIDE." It applied the trademark, and variations *436 thereof, to its storage batteries, related parts and accessories from 1901, through the years in issue. In 1932, ESB began to register the EXIDE trademark, and variations thereof, with the United States Patent Office when it received a certificate of registration from the Patent Office for the trademark "EXIDE" for use with respect to its batteries, related parts and accessories. In 1935, it received a certificate or registration for the trademark "EXIDE IRONCLAD" for use with respect to storage batteries and parts. In subsequent years similar certificates of registration were obtained for the trademarks "EXIDE ACCUMULATOR," "EXIDE-TYTEX," "EXIDOL," and "WHEN IT'S AN EXIDE YOU START." ESB intensively advertised and promoted its trademarks and they became well known nationally and internationally. Batteries and other products bearing the EXIDE trademark were consistently and conspicuously used in cars, airplanes and other vehicles and in events of historical significance including the first self-starting automobile, Admiral Byrd's first flight over the North Pole, Piccard's balloon flight to the stratosphere, and various planetary, lunar and other explorations in space, including *437 voyages by the Mariner, Ranger, and Surveyor rockets. EXIDE was ESB's most important trademark and over the years preceding 1967 ESB had established a policy of taking any action necessary to prevent the unauthorized use of any trademark confusingly similar to or which tended to infringe upon the EXIDE trademark. Such actions included trademark cancellation and opposition proceedings in the United States as well as foreign countries. For example, in Electric Storagee Battery Company v. Ex-Cell Battery & Equipment Company, 537 Off. Gaz. Pat. Off. 721 (April 6, 1942) (Cancellation No. 3979), ESB obtained the cancellation of the trademark EXCELL which had been issued to the Ex-Cell Battery & Equipment Company for use with respect to storage batteries. Prior to January of 1968, Standard Oil Company of New Jersey ("Standard Oil"), the predecessor to EXXON Corporation, undertook to register the trademark "EXXON" in a number of foreign countries for use with respect to any product Standard Oil might wish to sell, including batteries and related products. Upon becoming aware in January 1968 of Standard Oil's plan to adopt and use the EXXON trademark, ESB immediately instituted *438 legal proceedings to prevent such registrations in every country in which Standard Oil had attempted to register the EXXON trademark for use with respect to batteries of any class of product that could include batteries or related products covered by the EXIDE trademark. ESB's opposition to the EXXON trademark was limited because ESB did not oppose the registration or use of the EXXON trademark with respect to products other than batteries or other products that were sold by ESB under its EXIDE trademark. Furthermore, ESB did not oppose Standard Oil's proposal to adopt "EXXON" as its corporate name. In March 1968, ESB notified Standard Oil that it wished to protect its EXIDE trademarks "from any dilution of invalidity," and advised Standard Oil that "unless . . . we can arrive at a settlement whereby your Company undertakes not to use EXON or EXXON on batteries (and related items such as parts and accessories), and also to delete coverage for these goods from existing registration and applications for EXXON and EXON, we will be compelled to take appropriate proceedings to protect our trademark." In April 1968, counsel for ESB, met with counsel for Standard Oil, to discuss the EXXON *439 trademark. At this meeting ESB expressed concern that the EXXON trademark would be confusingly similar to the EXIDE trademark if used with respect to batteries. Nevertheless, on April 29, 1968, Standard Oil filed with the United States Patent Office an application for registration of the EXXON trademark for use with respect to batteries. In response, ESB filed a notice of opposition to the application with the Trademark Trial and Appeal Board of the United States Patent Office. In its notice of opposition, ESB claimed that the use of EXXON as a trademark with respect to storage batteries would result in confusion, mistake, or deception as to the source of storage batteries; the use of such trademark would damage ESB; and, therefore, Standard Oil should not be permitted to register the EXXON trademark with respect to storage batteries. In addition to the above application for registration of the EXXON trademark for use in the United States with respect to batteries, Standard Oil during the next four years applied for registrations of the EXXON trademark for various other uses in several foreign countries, as well as in the United States. [3] The other uses included rubber tires, *440 asphalt, and rust preventing materials. ESB continued to counter by filing notices of opposition to and petitions for cancellation of such registrations on the grounds that ESB had built up and owned valuable good will and a reputation symbolized by its EXIDE mark and that the registration of the EXXON trademark would result in confusion, mistake or deception with resulting damage to ESB, its products, and services. At no time did ESB allege, claim, refer to, or attempt to obtain "lost profits" in any of the documents filed within the United States Patent Office or any other tribunal or administrative body with respect to the EXXON trademark. Throughout this period, ESB and Standard Oil were continuously engaged in settlement negotiations. Initially, ESB offered to settle the dispute if Standard Oil would agree not to register or use the EXXON trademark with respect to batteries in those countries, including the United States, in which ESB had a legal interest *441 by reason of its EXIDE trademark. However, Standard Oil was unwilling to settle the dispute in this manner. As negotiations progressed, Standard Oil raised the possibility of settling the dispute on a monetary basis with an offer in July 1971 of $ 300,000, which ESB rejected. Again in October 1972 Standard Oil offered "to pay to ESB the sum of one million ($ 1,000,000) dollars as 'compensation' for the alleged detriment to ESB's goodwill in the trademark EXIDE, and to reimburse ESB for its expenses to date in challenging [Standard Oil's] trademark EXXON" provided ESB would withdraw all objections to the EXXON trademark. This offer was followed by a series of meetings between officers of ESB and Standard Oil, and later its successor, EXXON Corporation. At these meetings Standard Oil and later EXXON Corporation made it clear that they wanted the flexibility of using the EXXON trademark with respect to any and all products. ESB indicated that it would be willing to settle for just compensation for "destruction of a valued asset." After this series of meetings ESB made a counter offer to settle the dispute for $ 9,945,000, which amount ESB "calculated" by estimating "future *442 damage to its goodwill" by projecting one-half of one percent of its estimated annual sales under the EXIDE mark "during the ten years following 1972." On June 14, 1973, a final meeting was held, at which representatives of ESB and EXXON Corporation agreed in principle to settle the trademark dispute upon the payment by Exxon to ESB of $ 5,000,000. The formal agreement which was subsequently executed by the parties reads as follows: AGREEMENT made this 6th day of August, 1973 between ESB Incorporated (hereinafter known as ESB), a Delaware corporation, and Exxon Corporation (hereinafter known as Exxon), a New Jersey corporation. WITNESSETH
ESB is and has been for many years the owner of the trademark "EXIDE" and the good will appertaining thereto, such trademark having been registered and used on electric batteries and other products both in the United States and foreign countries. Exxon has adopted and is using the name "EXXON" as its corporate name as well as a trademark on a multiplicity of products and has filed applications for registration of the same as a trademark in both the United States and foreign countries. ESB has filed oppositions against certain of *443 Exxon's pending trademark applications and cancellation Petitions against certain of Exxon's issued trademark registrations claiming confusing similarity of the marks resulting in diminution and dilution of the distinctiveness of the trademark "EXIDE" and ESB's good will appertaining to such mark. The parties are desirous of settling all pending and future controversies involving the terms "EXXON" and "EXIDE" on an amicable basis. NOW, THEREFORE, in consideration of the mutual promises set forth hereinafter and intending to be legally bound thereby the parties agree as follows: 1. Exxon agrees to pay ESB the sum of Five Million Dollars ($ 5,000,000) in cash on or before September 1, 1973. 2(a) Exxon agrees that it will not object to or contest ESB's right to use or register the term "EXIDE" anywhere in the world in connection with any goods, products or services, other than fuels or lubricants for internal combustion engines, furnaces, or ranges or services in connection with the sale of such products. 2(b) Exxon further agrees that it will not object to or contest ESB's right to use or register the term "EXIDE" anywhere in the world as its corporate or trade name whether *444 such term is used by itself or in connection with other distinguishing devices or symbols. 3. ESB agrees that it will promptly withdraw all pending oppositions and cancellation proceedings with respect to registration of the term "EXXON" wherever pending and that it will not in the future object to or contest Exxon's right to use or register the term "EXXON" anywhere in the world in connection with any goods, products or services, or as its corporate or trade names whether such term is used by itself or in connection with other distinguishing devices or symbols. 4. Neither party will give any publicity to or disclose the fact of or the terms of this Agreement except to the extent required by applicable generally accepted accounting principles and reporting requirements, or by law or governmental regulations, and each party will use its best effort to maintain the confidentiality of this Agreement except as otherwise so required. IN WITNESS WHEREOF, we have set our hands and seals this 6th day of August, 1973. In accordance with the above agreement, ESB withdrew its notices of objections to and petitions for cancellation of the registrations of the EXXON trademark, and *445 EXXON Corporation paid ESB $ 5,000,000 during ESB's taxable year ended March 31, 1974. On its income tax return for the year ended March 31, 1974, ESB reported the $ 5,000,000 received from Exxon Corporation, less the $ 225,000 in legal fees which ESB had incurred with respect to the various proceedings in opposition to the EXXON trademark and in negotiating the settlement, as proceeds from the sale of a capital asset, i.e., as a capital gain. In his notice of deficiency respondent determined that such proceeds constituted ordinary income. OPINION In support of its contention that the proceeds should be taxed as capital gain, petitioner argues that the proceeds were received in settlement of a legal claim instituted by ESB to prevent damage to a capital asset. In the alternative, petitioner argues that if we find, as contended by respondent, that the proceeds were not paid and received in settlement of the trademark litigation but instead such proceeds were received by ESB as the result of a normal commercial transaction between ESB and EXXON Corporation, such transaction still constituted a sale or exchange of a capital asset. Respondent counters with several contentions but *446 his primary argument is that the transaction between the parties amounted to a license whereby Exxon acquired the right to the EXIDE trademark and the payment was ordinary income in the nature of a license fee or royalty. For the reasons set forth below, we agree with petitioner's first argument. We have long recognized the rule that "The taxability of the proceeds of a lawsuit, or of a sum received in settlement thereof, depends upon the nature of the claim and the actual basis of recovery." Sager Glove Corp. v. Commissioner,36 T.C. 1173, 1180 (1961), affd. 311 F.2d 210 (7th Cir. 1962), cert. denied 373 U.S. 910 (1963); see also Victor E. Gidwitz Family Trust v. Commissioner,61 T.C. 664, 673 (1974); State Fish Corp. v. Commissioner,48 T.C. 465, 472 (1967), modified by 49 T.C. 13 (1967). The nature of a litigation recovery is determined by reference to the origin and character of the claim which gave rise to the litigation. Victor E. Gidwitz Family Trust,61 T.C. at 673. Thus, amounts received for injury or damage to capital assets are taxable as capital gain, whereas *447 amounts received for lost profits are taxable as ordinary income. State Fish Corp.,48 T.C. at 472. In State Fish Corp., supra, we concluded that a recovery received by a taxpayer constituted compensation for diminution in the goodwill of his business and, therefore, was taxable as a capital gain. 48 T.C. at 477. In that case, the taxpayer had bought an established and ongoing business, with the seller agreeing not to open a similar business and compete with the taxpayer for a period of five years. The seller, however, breached the convenant not to compete, and the taxpayer brought suit alleging damage to the goodwill of the business. After the taxpayer was awarded a judgment, he seller paid a lesser sum in settlement of the judgment. In concluding that the recovery was for damages to goodwill rather than lost profits, as contended by respondent, we relied heavily upon the allegations set forth in the complaint, a majority of which concerned goodwill. 48 T.C. at 474. In the present case, although there was no lawsuit between ESB and the EXXON Corporation in the usual sense, it is apparent that ESB and EXXON Corporation *448 were adversaries in the numerous proceedings before the United States Patent Office and similar tribunals in foreign countries. Furthermore, had the parties not reached a settlement, we are certain that ESB would have filed appropriate lawsuits against EXXON Corporation. Consequently, we see no reason to treat the settlement of the trademark dispute between ESB and the EXXON Corporation any differently than the settlement of claims which have proceeded to actual suit such as those involved in Sagar Glove Corp. v. Commissioner, supra;Victor E. Gidwitz Family Trust v. Commissioner, supra; and State Fish Corp. v. Commissioner, supra; and after carefully reviewing the entire record in the light of these decisions, we are satisfied that in this case the underlying dispute between ESB and the EXXON Corporation was in nature of a claim for damages to the EXIDE trademark and the goodwill associated therewith. First, of all the objections, petitions to cancel, and other documents filed by ESB in the trademark proceedings centered on the potential damage to the EXIDE trademark and goodwill. The same is also true with respect to the settlement *449 negotiations, in which ESB consistently and repeatedly sought to protect these assets. Furthermore, ESB never alleged that it was entitled to, or attempted to obtain, lost profits. The subject of the possible impact of the EXXON trademark on ESB's sales arose only in ESB's attempt to place a value on the damage to the trademark and goodwill. Such a use of lost profits as an evidentiary factor in determining damage to goodwill has been held not to alter the true basis of the recovery. Raytheon Production Corp. v. Commission,144 F.2d 110, 113 (1st Cir. 1944), cert. denied 323 U.S. 779 (1944), affg. 1 T.C. 952 (1943); Farmers' and Merchants' Bank v. Commissioner,59 F.2d 912, 913 (6th Cir. 1932); [4]State Fish Corp.,48 T.C. at 475-477. We see no reason not to arrive at the same conclusion with respect to the EXIDE trademark. Having decided that ESB's claim was for damages to the EXIDE trademark and associated goodwill, we need only to characterize the nature of these assets which we find to *450 be capital assets. With respect to a trademark, being a capital asset for Federal income tax purposes, see Consolidated Foods Corp. v. United States,569 F.2d 436 (7th Cir. 1978); United States v. Adamson,161 F.2d 942 (9th Cir. 1947); Avery v. Commissioner,47 B.T.A. 538 (1942). For similar holdings with respect to goodwill, see Ensley Bank and Trust Co. v. United States,154 F.2d 968, 969 (5th Cir. 1946), cert. denied 329 U.S. 732 (1946); VGS Corp. v. Commissioner,68 T.C. 563, 589 (1977); Michaels v. Commissioner,12 T.C. 17, 19 (1949). Therefore, in ultimate conclusion, we find that the actual basis of the recovery of the settlement proceeds by ESB was for damages to its trademark and the associated goodwill. Since these items are capital assets the proceeds are taxable as capital gains. [5]
In arriving at the above conclusion, we have carefully considered respondent's primary argument that the settlement agreement constitutes a license, i.e., that ESB merely granted *451 the EXXON Corporation a limited right to use the EXIDE trademark without interference. The argument is not persuasive, however, because the record contains no evidence from which we can find or reasonably infer that ESB and the Exxon Corporation intended to enter into a license agreement or any other type of ongoing relationship. Furthermore, the settlement agreement does not contain some important characteristics which are commonly found in license agreements. First, under the settlement agreement, ESB had no control over the nature and quality of the products covered by the trademark, which is the touchstone of the usual trademark license. 1 J. Gilson, Trademark Protection and Practice sec. 6.01 [4], at 6-8 (1984 ed.). Secondly, any rights granted by ESB under the settlement agreement to EXXON Corporation were perpetual, not of a limited duration, as is usual in the case of a license. See Armour v. Commissioner,22 T.C. 181 (1954); Seattle Brewing & Malting Co. v. Commissioner,6 T.C. 856, 869-870 (1946), affd. 165 F.2d 216 (9th Cir. 1948). Thirdly, the settlement agreement provided for a lump-sum *452 payment rather than the usual periodic or variable production payments. See Seattle Brewing & Malting Co. v. Commissioner,6 T.C. at 869. Finally, ESB had no right to terminate the agreement. See Seattle Brewing & Malting Co., supra,6 T.C. at 871; Jones v. Pepsi-Cola Co.,223 F. Supp. 650, 654 (D. Neb. 1963). We have also considered but are not persuaded by respondent's other arguments, which for the most part are directed to petitioner's alternative contention, which we do not reach, that the settlement was a normal commercial transaction constituting a sale or exchange of a capital asset. Decisions will be entered under Rule 155.
Footnotes
1. The stipulations concerning conceded issues govern those issues exactly as the stipulations are written. ↩
2. For purposes of clarity and simplicity, we will use "ESB" to refer to both ESB and the Electric Storage Battery Company. ↩
3. The foreign countries included Argentina, Barbados, Belgium, Bolivia, Brazil, Canada, Colombia, Costa Rica, Ecuador, Ghana, Greece, Haiti, Jamaica, Lebanon, Norway, El Salvador, Switzerland, Uruguay, and Venezuela. ↩
4. Reversing 20 B.T.A. 622 (1930), but thereafter cited with approval by us in State Fish.↩
5. Because of this holding, it is not necessary to address petitioner's alternative judgment. ↩