CLAUDE B. KENDALL AND STELLA KENDALL, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65501.    Filed December 18, 1958.

*Lee M. LeMay, Esq.,* and *Arthur J. Sullivan, Esq.,* for the petitioners.

*Charles B. Norris, Esq.,* for the respondent.

OPINION.

VAN FOSSAN, *Judge:* The only question here is whether any part of the sum of $98,000 received by petitioners from the State of Indiana as a result of the involuntary conversion of their property taken under threat of condemnation should be treated for tax purposes as compensation for anticipated loss of business or loss of profits.

Respondent contends that $24,000 of the $98,000 purchase price was paid as consideration for loss of business and consequently should be included in petitioners' gross income in accord with section 61 (a) of the Internal Revenue Code of 1954.[1]

Petitioners contend that the entire $98,000 was received as a lump sum in consideration of execution of a grant of right-of-way under threat of condemnation, no part of such sum being paid on account of loss of business, and that accordingly, having invested the entire sum in other property similar or related in service or use, they are not required

[1] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
- (1) Compensation for services, including fees, commissions, and similar items;
- (2) Gross income derived from business;
- (3) Gains derived from dealings in property;
- (4) Interest;
- (5) Rents;
- (6) Royalties;
- (7) Dividends;
- (8) Alimony and separate maintenance payments;
- (9) Annuities;
- (10) Income from life insurance and endowment contracts;
- (11) Pensions;
- (12) Income from discharge of indebtedness;
- (13) Distributive share of partnership gross income;
- (14) Income in respect of a decedent; and
- (15) Income from an interest in an estate or trust.

to report any gain on the transaction under the terms of section 1033 of the Internal Revenue Code of 1954.[2]

The respondent relies chiefly upon an appraiser's report prepared for petitioners prior to the beginning of negotiations, and on a "status sheet" prepared by Teverbaugh prior to or just after the transaction, both of which were produced from the State Highway Department files. The appraiser's report indicated a total valuation of $137,000 and included items of $24,000 for loss of operation due to the time required to move to a new location, and $20,000 for loss of business because of change of location.

The status sheet included an item of $24,000 for loss of business in its breakdown of the $98,000 finally agreed upon. Respondent concluded from these two documents that the $98,000 sales price included $24,000 as payment for loss of business and $74,000 for physical assets.

The record does not support the respondent's conclusion.

Sullivan, who represented petitioners in all the negotiations with the State pertaining to the shrimp house and who had a clear recollection of the matter, testified unequivocally that he never discussed an amount for the loss of profit or for damage to or destruction of business with Teverbaugh, and that these factors never entered into consideration in arriving at the price finally agreed upon.

---

[2] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph :

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. For purposes of this paragraph—

(i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition ; and

(ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (c) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012.

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

When Teverbaugh was asked whether in the negotiations there was any reference to damages for loss of business, he replied, "Well, I can't truthfully say. I mean I don't know." He then added the assumption, "According to the status and appraisal I would say yes."

Sullivan testified by way of background that he had participated in some 150 to 200 condemnation proceedings where settlements were negotiated; that he always approached such a transaction as a lump-sum matter; that when your opponent gets you to discussing separate items you are at a disadvantage.

Sullivan further testified that in the negotiations between himself and Teverbaugh he first asked $120,000; Teverbaugh countered with $80,000 as his figure; Sullivan dropped to $110,000 and Teverbaugh raised his position to $85,000 or $90,000; they finally agreed on $98,000 as a compromise and as a lump-sum settlement.

Not only does the record before us support the petitioners' contentions; they are also supported by the probabilities of the situation. If, contrary to the above testimony, the negotiators had discussed the separate items, clearly the weakest items in the list contained in the appraisal were the loss of profits and loss of business. The fact is that by the time the negotiations were concluded, actual experience had shown that there would be no basis for claiming such items. There had been no loss of business or profits and ultimately the restaurant was closed only 3 days in making the move to the new quarters. Again, if the parties had discussed the separate items, it is only reasonable to conclude that the $98,000 figure would have been arrived at, not by including a factor for loss of business and loss of profit, but by deleting from the $137,000 total in the appraiser's report the sum of $24,000 for loss of operation during the estimated 6 months required to move to a new location, and the item of $20,000 because of loss of business from the change of location. To the $93,000 thus arrived at it would have been necessary to add only $5,000 to reach the total ultimately agreed upon.

The right-of-way grant, which represented the final compromise and set forth the figure of $98,000 as a single sum, contains a provision as follows: "It is understood and agreed that all provisions of this grant are stated above and that no verbal agreements or promises are binding." This document was signed by both parties and was followed by payment.

This above statement is merely a rephrasing of the rule of law that all preliminary considerations are merged in the written contract ultimately arrived at and executed.

Whatever may have gone before, the record before us clearly shows that petitioners have carried their burden of proof and have established that the final settlement was a lump-sum transaction. Neither the actual grant of the right-of-way, the voucher for the purchase

price, nor the receipt for the warrant issued in settlement of the voucher made any allocation of the $98,000 figure.

This Court has held in similar situations involving involuntary conversions under threat of condemnation that a lump-sum purchase price is not to be rationalized after the event as a combination of factors which might properly have been separately stated in the contract if the parties had seen fit to do so. *Marshall C. Allaben*, 35 B. T. A. 327 (1937); *O. N. Bymaster*, 20 T. C. 649 (1953); *Lapham* v. *United States*, 178 F. 2d 994 (C. A. 2, 1950).

The Court of Appeals for the Second Circuit in the *Lapham* case, *supra*, affirmed a District Court opinion sustaining the Commissioner's determination, and stated (p. 996):

In short, there was here a purchase and sale of a designated parcel of land at a designated price and that price when received was for income tax purposes the amount realized for the property sold. It has heretofore been held after the value of the property sold has thus been established, it is too late for the seller to reduce it for tax purposes by dividing it into parts labeled value and damages respectively. See Marshall C. Allaben v. Commissioner of Internal Revenue, 35 B. T. A. 327. But this is so, not because it would be more difficult to make an allocation in terms of dollars and cents after the sale than before, but because what the seller actually received is what he has realized on the disposal of it by sale.

The above-cited cases all involve attempts by taxpayers to apportion lump-sum amounts. However, the rule should apply with equal force to respondent's present attempt to label a part of the $98,000 received by petitioners as consideration for anticipated loss of profits. We accordingly find no basis in fact or in law for concluding that any part of the amount received by petitioners was other than consideration paid for the property taken. Cf. *Estate of Jacob Resler*, 17 T. C. 1085 (1952).

Reviewed by the Court.

*Decision will be entered for the petitioners.*