Estate of Chesley M. Walter, Deceased, United California Bank, Executor and Dorothy M. Walter v. Commissioner.
Estate of Walter v. Commissioner
Docket No. 6374-69.
United States Tax Court
T.C. Memo 1971-244; 1971 Tax Ct. Memo LEXIS 86; 30 T.C.M. (CCH) 1051; T.C.M. (RIA) 71244; September 27, 1971, Filed. Sheridan Downey, III, 1100 Financial Center Bldg., 405 Fourteenth St., Oakland, Calif., for the petitioners. Richard D. Worsley for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: For 1965 respondent has determined a deficiency in petitioners' income tax of $3,878.05. The only issue presented for decision is whether in 1965 Chesley M. and Dorothy M. Walter received interest income of $7,548 in respect of the condemnation of a part of a parcel of their real property. Findings of Fact Some of the facts have been stipulated, and are so found. Petitioner Dorothy M. Walter resided in Oakland, California, at *87 the time of the filing of the petition herein. Chesley M. Walter, deceased (hereinafter sometimes referred to as Chesley), was married to Dorothy M. Walter and filed with her a joint Federal income tax return for the taxable year 1965 with the district director of internal revenue in San Francisco, California. Chesley died on December 29, 1968. On January 17, 1969, petitioner United California Bank, a California corporation having its principal office in Oakland, California, was 1052 appointed executor of the estate of Chesley M. Walter, deceased. On January 31, 1962, the State of California (hereinafter sometimes referred to as the State), acting by and through its Department of Water Resources, commenced an eminent domain action under the laws of the State with respect to approximately 8.69 acres of certain unimproved real property belonging to the Walters. The purpose of the eminent domain action was to condemn a right of way which was to be used for a proposed aqueduct. The condemned property was located in the Livermore, California, area and was part of a large tract which the Walters owned. The right of way bisected the larger tract in such a way that a part of the larger *88 tract was cut off from access to the street. The property actually the subject of the eminent domain action will hereinafter be referred to as the Livermore property. Also on January 31, 1962, the superior court for the county of Alameda entered its order granting to the State the right to possession and use of the Livermore property. Pursuant to such order the State deposited $8,690 with the superior court as security for performance of its obligations under the eminent domain action with respect to the Livermore property. In their answer in the eminent domain action the Walters alleged that there was compensation due for the actual taking of the property underlying the aqueduct as well as for the severance of the portion of the remaining property that was to be cut off by the aqueduct. After the commencement of the action Chesley (individually and through his attorney) and agents of the State entered into negotiations for the sale of the Livermore property. The Livermore property was conveyed to the State by a grant deed dated October 6, 1965. This deed was recorded in Alameda County on November 16, 1965. On or about October 19, 1965, the State and the Walters entered into *89 an agreement entitled "Right of Way Contract - Department of Water Resources" (hereinafter referred to as the right of way contract). The right of way contract related to the Livermore property and provided, in pertinent part, as follows: Document No. DLV-30 in the form of a GRANT DEED covering the property particularly described in the above instrument has been executed and delivered to HARRY J. SHILLICK, Right of Way Agent for the State of California. In consideration of which, and the other considerations hereinafter set forth, it is mutually agreed as follows: 1. The parties have herein set forth the whole of their agreement. The performance of this agreement constitutes the entire consideration for said document and shall relieve the State of all further obligation or claims on this account, or on account of the location, grade or construction of the proposed public improvement. 2. The State shall: (A) Pay the undersigned grantor(s) the sum of $38,300.00 for the property or interest conveyed by above document(s) when title to said property vests in the State free and clear of all liens, encumbrances, assessments, easements and leases (recorded and/or unrecorded), and *90 taxes, except: a. Taxes for the fiscal year in which this escrow closes which shall be cleared and paid in the manner required by Section 4986 of the Revenue and Taxation Code, if unpaid at the close of escrow. * * * 3. Any or all moneys payable under this contract, up to and including the total amount of unpaid principal and interest on note(s) secured by mortgage(s) or deed(s) of trust, if any, together with penalty (if any) for payment in full in advance of maturity, and all other amounts due and payable in accordance with the terms and conditions of said trust deed(s) or mortgage(s) shall, upon demand(s) be made payable to the mortgagee(s) or beneficiary(s) entitled thereunder; said mortgagee(s) or beneficiary(s) to furnish grantor with good and sufficient receipt showing said moneys credited against the indebtedness secured by said mortgage(s) or deed(s) of trust. * * * 5. The undersigned grantor(s) hereby agree(s) and consent(s) to the dismissal of any eminent domain action in the Superior Court wherein the herein described land is included and also waive(s) any and all claims to any money that may now be on deposit in said action. * * * 7. It is agreed and confirmed *91 by the parties hereto that notwithstanding other provisions in this contract, the right of 1053 possession and use of the subject property by the State, including the right to remove and dispose of improvements, commenced January 31, 1962 and that the amount shown in Clause 2(A) herein includes, but is not limited to, full payment for such possession and use, including damages, if any, from said date. The eminent domain action with respect to the Livermore property was dismissed by order of the superior court on May 31, 1966. By such order, the superior court also released to the State the security deposit of $8,690. Chesley was an attorney but he also bought and sold a fair amount of real property and was reasonably conversant with property values. In 1965 the Walters owned at least 10 separate parcels of real property. Included among these parcels were income-producing parking lots and apartments. On all eminent domain matters in which he was involved, Chesley would consult with the law office of Ned Robinson who was, at all times relevant herein, an attorney licensed to practice law in the State of California. Since about 1962 Robinson's specialty has been the eminent *92 domain area. Robinson advised with Chesley regarding the eminent domain action concerning the Livermore property. Commencing from the time he began advising Chesley through the date the action was finally terminated, Robinson consulted with Chesley in a professional capacity on several occasions. In particular he often advised Chesley on the advisability of accepting an offer from the State. In the fall of 1965 Robinson learned that Chesley had finally settled the action. At that time Chesley indicated to Robinson that he had received an offer of approximately $38,000 from the State. In further discussion Chesley and Robinson indicated to each other that the offer was a fair one. Chesley also indicated that he was inclined to accept the offer. Robinson asked Chesley if the State had given him a breakdown of the offer. Chesley answered that the State would not give him a breakdown. Henry J. Shillick is a right of way agent for the State's Division of Highways. [1] As of the date of trial, Shillick had been employed by the State for eight years, and his agency had been in charge of acquiring the Livermore property for the Department of Water Resources. It was Shillick's job as *93 acquisition agent or negotiator to arrange for a final contract with the Walters. In such capacity he presented Chesley with information concerning what the State was acquiring, the purpose of the acquisition, and what the State was willing to offer. Shillick did not himself appraise land. An appraiser would appraise property that was to be condemned. After the appraiser arrived at a value, the acquisition agent or negotiator and several other right of way agents from the Division of Highways would follow the appraiser through the entire appraisal process. If the negotiator concurred in the appraiser's approach, the appraisal would be sent back to the State capital at Sacramento. If approved there, the appraisal would be sent back to the acquisition agent who would then make an offer in writing to the property owner. Other properties necessary for the proposed aqueduct had been condemned more or less simultaneously. Altogether, Shillick negotiated over 100 aqueduct contracts similar to the Walters' contract, and settled about 90 percent of them without trials. After *94 the State had made an appraisal in early September 1965, Shillick made an offer to Chesley at Chesley's office. Shillick had two subsequent meetings with Chesley and the two also engaged in several phone conversations. Prior to that time the State had made an offer to Chesley in which Shillick did not participate. During the one or two-month period in which Shillick was negotiating with Chesley, Chesley explained to him that he thought the adjoining parcel of land had been damaged by the taking of the property. Chesley was also concerned with obtaining the fair market value of the Livermore property. As the Livermore property had been under an order of possession and use for over three years, one of Shillick's main concerns was the matter of interest. In making the offer to Chesley, Shillick gave him the single figure of $38,300 and stated to him that it consisted of amounts for the actual taking of the property, severance damages, and interest. Shillick did not personally give Chesley a breakdown 1054 of the $38,300 figure, but it was the policy of the Division of Highways to give a breakdown in writing on the State letterhead at the written request of the grantor. Shillick *95 so advised Chesley and advised him to make such written request. The figures the State used in computing the amounts for the actual taking and for severance damage were computed by an appraiser other than Shillick, however, it was a normal duty for a negotiator in Shillick's agency to compute interest and Shillick himself computed the interest element in issue. He calculated this interest element prior to the negotiations leading up to the signing of the right of way contract, using a seven-percent rate to arrive at an interest element of $7,548. On their income tax return for 1965 the Walters reported that they had received on November 18, 1965, the sum of $38,279.10 as a condemnation award for the Livermore property. From that sum they subtracted a cost of $4,378.04, and attorney fees of $100 to arrive at a realized gain of $33,801.06. They sought to escape recognition of gain upon the entire $33,801.06 by applying it to lower the basis of certain parcels of unimproved land which they had acquired in November 1964. See sec. 1033(a)(3) and (c). [2]
In the notice of *96 deficiency, respondent determined that the Walters received $7,548 as interest income "for the period of negotiations pertaining to the condemnation of your Livermore property." Opinion On January 31, 1962, the State of California began eminent domain proceedings with respect to the Livermore property owned by the Walters. On the same day the superior court for the county of Alameda entered its order granting to the State the right to possession and use of the Livermore property. After protracted negotiations between Chesley and the State, the Livermore property was formally conveyed to the State by a grant deed on October 6, 1965, and the deed was recorded on November 16, 1965. Shortly thereafter the State paid the Walters approximately $38,300. As indicated in their tax return the Walters apparently tried to take advantage of the nonrecognition provisions of section 1033. [3] They sought nonrecognition for the entire difference between the amount received from the State (less certain attorney fees) and their original cost for the Livermore property. *97 On the record before us, it appears (and petitioners do not argue otherwise) that for all practical purposes and for the purposes of section 1033 the involuntary conversion of the Livermore property took place on January 31, 1962. On that date the superior court issued its order giving possession and use of the Livermore property to the State. There is no indication that the Walters intended to dispute the State's right to take the Livermore property. It appears that their only concern with the Livermore property after that date was to make sure that they would receive a fair award for the condemned land. [4] We conclude then that the Walters' right to just compensation accrued as of that date; the only matter remaining in dispute after that date was the amount of such compensation. Petitioners urge that the entire compensation which they received from the State may be broken down into, at most, two components: (1) a part for the *98 fair market value of the property actually taken; and (2) a part for damages incident to the severance of the Livermore property from the larger tract owned by the Walters. While not specifically stated by petitioners, the upshot of their contention is that any gain realized in respect of the component representing the fair market value of the property actually taken would be eligible for nonrecognition under section 1033, and if they received any amounts in respect of a component representing severance damages, such amounts would be nontaxable. 1055 Compare, e.g., Arch B. Johnston, 42 T.C. 880 (1964) and L.A. Beeghly, 36 T.C. 154 (1961) with Lapham v. United States, 178 F. 2d 994 (C.A. 2, 1950). Respondent, on the other hand, contends that the amount the Walters received from the State should be broken down into three separate components attributable to (1) the land actually taken, (2) severance damages, and (3) interest computed on the amount attributable to the first two components. Respondent would have us hold that because Chesley's right to just compensation effectively accrued on January 31, 1962, the amount finally agreed upon in *99 settlement of the eminent domain action necessarily included a component in acknowledgement of the fact that the Walters were deprived of the possession and use of the Livermore property for over three years before they finally received payment for it. If respondent's view is followed, it is clear that whether this component is characterized as interest, compensation for delay of payment, indemnification for delay, or an amount in lieu of what petitioners might have earned on the sum found to be the value of the property on the day the property was converted, it would not be an amount in payment for the Livermore property itself. Kieselbach v. Commissioner, 317 U.S. 399 (1943). The interest [5] component would not be eligible for nonrecognition under section 1033 because that section allows recognition only for gain attributable to the involuntary conversion of the property itself. Cf. Claude B. Kendall, 31 T.C. 549 (1958). Consequently, any such interest component would be taxable as ordinary income. The question before us is one of fact, *100 namely, whether the payment by the State to the Walters included an interest component. See Peter Vaira, 52 T.C. 986, 1001, fn. 13 (1969), modified, 444 F. 2d 770 (C.A. 3, June 18, 1971), where, in a very similar fact situation, we alluded to, but did not meet, this same question. In answering that question we must view the payment in light of the negotiations and other pertinent circumstances leading up to it. Peter Vaira, supra; Arch B. Johnston, supra; L.A. Beeghly, supra.
The fact that the issue of compensation was not finally resolved at trial in the superior court does not mean that we cannot inquire into the true make-up of the final settlement between the State and the Walters. It has been held by both this Court and the Ninth Circuit, that where a case is tried, goes to judgment, and is subsequently satisfied for less than the judgment, it is proper to apportion the amounts actually received in accordance with the allocation provided in the judgment. Spangler v. Commissioner, 323 F. 2d 913, 916 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; State Fish Corp., 48 T.C. 465, 471 (1967), *101 supplemented by, 49 T.C. 13 (1967). Consequently, where, as here, a settlement is reached before trial, we do not believe that we are precluded from apportioning that settlement in conformity with the realities of the bargaining between the negotiating parties. Petitioners argue that the decisions in such cases as Lapham v. United States, 178 F. 2d 994 (C.A. 2, 1950); Best Universal Lock Co., 45 T.C. 1 (1965); Claude B. Kendall, 31 T.C. 549 (1958); Estate of Jacob Resler, 17 T.C. 1085 (1952); and Marshall C. Allaben, 35 B.T.A. 327 (1937), make it unnecessary and improper for this Court to break down a lump sum award after the State and the Walters had reached agreement. We cannot agree. First, the rule proposed by petitioners would leave the revenue-collecting arm of the Federal government open to all manner of subterfuge were it possible for contracting parties to determine, solely between themselves, the tax treatment to be accorded their transaction. See, e. g., Sterling G. Howlett, 56 T.C. - (August 9, 1971). Secondly, the cited cases do not stand for the proposition suggested by petitioners. In Best *102 Universal Lock Co. the issue was one of burden of proof. We held that under the stipulated circumstances there, the taxpayer in seeking to offset moving expenses against a lump sum condemnation award, did not have to show the negative fact that moving expenses were not a part of the lump sum award, especially where there was no indication in the record that moving expenses were ever considered (or could properly be regarded) 1056 as an element of damages. In each of the other four cases it was specifically found as a fact that the payment sought to be broken down consisted solely of payment for the value of the property in question. In the instant case the record has been developed sufficiently so that we can affirmatively say whether the payment by the State to the Walters included an interest component. In light of the entire record the Commissioner's presentation at trial was the more persuasive. Therefore, we find as a fact and hold that the payment by the State to the Walters did include an interest component. We have reached that conclusion upon consideration of all of the factors made known to us upon this record. In particular, in viewing the substance of the negotiations *103 between Chesley and the State, we have constantly kept in mind Chesley's qualifications in the real estate field. Chesley was an attorney. He owned many parcels of income-producing real property. Petitioners' own witness, Robinson, testified that Chesley was knowledgeable in real estate matters. Consequently, one of our preliminary conclusions was that Chesley must have known that interest was not an uncommon element in condemnation awards. [6]
*104 In calculating what it would offer to the Walters the State, through its agent Shillick, considered $7,548 of the offer of over $38,000 as an amount attributable to interest accruing from January 31, 1962, the date of the superior court's grant of possession and use of the Livermore property to the State. Thus, the State certainly took into consideration an interest component in making its offer to Chesley. In light of Chesley's sophistication in real estate matters, it would be very hard for us to believe that Chesley did not similarly take into consideration some interest element in presenting counteroffers to the State. In summary, on the basis of the evidence before us, we hold that the settlement between the State and the Walters included an amount which was, and was understood and intended as, compensation for the approximately three-year delay in settlement. This component must be deemed as separate and apart from any amount paid for the property itself and consequently must be recognized in the year of its receipt. Having failed to persuade us that part of the condemnation settlement was not interest, petitioners have neither argued nor sought to prove that the dollar *105 amount determined to be interest by both the State and respondent was unreasonable or otherwise erroneously computed. Therefore, we conclude that in 1965 the Walters received $7,548 taxable as ordinary income. Decision will be entered for the respondent. Footnotes
1. Henry J. Shillick is the same person as the Harry J. Shillick mentioned in the right of way contract.↩
2. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended.↩
3. SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule. - If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted - * * * (3) Conversion into money where disposition occurred after 1950. - * * * (A) Nonrecognition of gain. - If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, * * *↩
4. It does not matter that the grant deed was not executed until October 1965. Execution of that deed was a mere formality when viewed in light of the fact that the State entered into possession and use of the Livermore property on January 31, 1962.↩
5. For lack of a better shorthand expression for this component we shall hereinafter refer to it as interest.↩
6. This preliminary conclusion is bolstered by the fact that Shillick, the State's right of way agent, told Chesley that the final award included a component for interest, and the fact that the grant deed expressly provided that the amount paid included "full payment for possession and use * * * [commencing] January 31, 1962." We also note that in California eminent domain proceedings section 1255b of the California Code of Civil Procedure (West Supp. 1971) provides that interest is deemed to accrue, at the latest, from the "date that the possession of the property sought to be condemned is taken." Petitioners suggest that this section applies only to actions which proceed to trial and finalize in judgment. We do not decide whether the operation of that section is so limited. We do believe, however, that the existence of that section is one more factor which tends to show that Chesley was aware of the importance of interest as an element of condemnation awards.↩