T.C. Memo. 2004-53

UNITED STATES TAX COURT

VISION INFORMATION SERVICES, L.L.C., IRENE CORREIA,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1750-01.                    Filed March 8, 2004.

Joseph Galasso, Jr., for petitioner.

Greg Okwuosah and Robert Heitmeyer, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioner petitioned the Court under section 6226 to readjust partnership items adjusted by respondent. Following the parties' concessions, we must decide whether Vision Information Services, L.L.C. (Vision), sold or instead licensed certain intellectual property to Twentieth Century Fox

(FoxVideo). Respondent determined and argues that Vision licensed the property to FoxVideo and, hence, that payments which Vision received from FoxVideo as to the transaction are taxable as ordinary income. Petitioner argues that Vision sold the property to FoxVideo and, hence, that the payments qualify for capital gain treatment. Petitioner concedes that the payments are ordinary income if the property was licensed rather than sold.

We agree with respondent. Unless otherwise noted, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts were stipulated. The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference. We find the stipulated facts accordingly. Vision is a limited liability company the headquarters of which was in Royal Oak, Michigan, when its petition was filed with the Court. For Federal income tax purposes, it is treated as a partnership, and its members are treated as its partners.

Vision was formed on February 3, 1995, to provide certain services to users of a base software package (Software) developed by a corporation named Nordic Information Systems, Inc. (Nordic). The Software helped track the movement of consumer goods between

manufacturers and retailers.  The certain services to be provided by Vision were data processing services, referred to as third party service bureau services, related to the Software.

Also on February 3, 1995, Vision and Nordic entered into a "Software license agreement" (license agreement) with respect to the Software.  The license agreement stated in relevant part:

> 2.  LICENSE GRANT AND RESTRICTIONS.
>
> 2.1  License.  Subject to the terms and conditions of this Agreement, Nordic grants to Vision, and Vision accepts, an exclusive perpetual worldwide license to use, copy, modify and enhance the Software, Source Materials and Manuals:  (i) to provide Third-Party Service Bureau Services to various third parties * * *; and, (ii) to sub-license the Software to FoxVideo to enable FoxVideo to use the Software to process its own data and the data of its affiliates * * *
>
> *    *    *    *    *    *    *
>
> 4.  OWNERSHIP, CONFIDENTIALITY AND PROTECTION OF SOFTWARE AND OTHER TRADE SECRETS.
>
> 4.1  Nordic Ownership of Software.  This license is not a sale.  Except as otherwise provided herein, title and all proprietary rights (patents, trade secrets, copyrights and trade marks) to the Software, and any copy made by Vision are held by Nordic.  The Software is copyrighted and is protected by United States and International Copyright Laws.

Nordic and Vision on the same day also entered into an annual maintenance agreement under which Nordic agreed "to provide support and maintenance" for the Software and Vision agreed to pay to Nordic a fee in exchange for Nordic's "On-Call Benefits" and "Time and Material Services".

Also on February 3, 1995, Vision and FoxVideo entered into a "Distribution Information Services Agreement" (Vision agreement). The Vision agreement entitled Vision to provide data processing services to FoxVideo in connection with the Software and described, among other things, the services to be performed, the territories affected, the terms of the agreement, the scope of exclusivity, and the prices for the services under the agreement. The Vision agreement stated in relevant part:

4. TERM: The Term shall commence as of February 3, 1995 ("Effective Date"), and unless earlier terminated, * * * shall last five years. FoxVideo shall have an option to extend the Term for an additional five-year period ("Initial Extension Period") on the following basis: the terms in effect at the outset of the Initial Extension Period (including the exclusivity terms) shall be the same as the terms in effect at the end of the first five year period, except that FoxVideo shall not be required to pay any additional license fee for the Vision Software License with respect to the Initial Extension Period, and such terms shall be subject to adjustment during the Initial Extension Period on the same basis as the initial terms during the first five-year period are subject to adjustment as provided herein. At the end of the Initial Extension Period (if any), the Vision agreement may be extended for successive additional five-year periods by mutual consent, provided that (a) no additional license fee for any such additional extension period shall ever be payable by FoxVideo; and (b) Vision's exclusivity commitments for any such extension period shall be subject to negotiation by the parties. Each 12-month period of the Term shall be referred to as a "Contract Year".

5. EXCLUSIVITY:

(a) By FoxVideo: For so long as the Vision agreement is in effect, FoxVideo shall procure Information Services for use in direct-to-store distribution of

videocassettes in the United States and Canada exclusively from Vision.

* * * * * * *

7. VISION SOFTWARE LICENSE/FEE:

   (a) Vision Software License:

   (i) Vision's License from Nordic: The continuing existence and validity of Vision's license of the Nordic Software from Nordic (including all maintenance and related agreements) (collectively the "Nordic Agreements") shall be of the essence of the Vision agreement. * * *

   (ii) Grant of License: Vision shall grant or cause to be granted to FoxVideo a worldwide, non-exclusive, non-transferable license ("Vision Software License") to use, on its own hardware or otherwise, the Vision Software [i.e., the Software as modified by Vision and any other software used by Vision in providing the information services to FoxVideo]. The Vision Software License shall have a term coextensive with the Term of the Vision agreement * * *

   * * * * * * *

   (b) License Fee:

   (i) Payment of Fee: Except as provided below, FoxVideo shall pay a License Fee to Vision in the aggregate amount of $10 million, payable as follows: (A) $3 million payable on signature of the Vision agreement; plus (B) $1.75 million payable on each of the first four anniversary dates of the signing of the Vision agreement. * * *

> (ii) <u>Reimbursement Upon
> Termination</u>: In the event that the
> Vision agreement is terminated
> before the end of the Term as a
> result of a default by Vision,
> FoxVideo will receive a
> reimbursement of a portion of the
> license fee paid to the date of
> termination, based upon an
> amortization of the license fee at
> the rate of $2 million per year.

Pursuant to the Vision agreement, FoxVideo paid Vision the referenced $3 million payment in 1995 and the referenced $1.75 million payment in 1996. On its 1995 Form 1065, U.S. Partnership Return of Income, Vision reported its receipt of the $3 million payment as long-term capital gain income from a $10 million installment payment sale of "exclusive rights&know how". On its 1996 Form 1065, Vision reported its receipt of $1,320,198 of the $1.75 million payment as long-term capital gain income and reported the rest ($429,802) as portfolio interest income.

On November 20, 2000, respondent mailed to petitioner a notice of final partnership administrative adjustment (FPAA) for 1995 and 1996. Respondent determined in the FPAA that both payments were taxable as ordinary income because, respondent determined, they were received by Vision as a license fee.

## OPINION

The parties dispute whether Vision sold or licensed to FoxVideo the property underlying the $3 million and $1.75 million payments. Petitioner argues that Vision sold this property to

FoxVideo in that, petitioner asserts, Vision transferred to FoxVideo the exclusive right to use the trade secrets and know-how embodied in the Software for their useful life of less than 4 years. Respondent argues that Vision licensed the Software to FoxVideo in that, respondent asserts, Vision and FoxVideo intended at the time of the pertinent agreements that the property would be licensed in exchange for a set fee and stated as much in those agreements.

We agree with respondent. Our decision turns on the intent of the parties to the pertinent agreements as ascertained as of the time that they entered into these agreements. Pickren v. United States, 378 F.2d 595, 599-600 (5th Cir. 1967). We ascertain this intent primarily by construing the pertinent agreements. Id.; see also Redler Conveyor Co. v. Commissioner, 303 F.2d 567, 569 (1st Cir. 1962), affg. T.C. Memo. 1961-82. Petitioner asserts on brief that respondent bears the burden of proof for 1996 by virtue of section 7491(a). The parties, however, stipulated that petitioner bears the burden of proof as to both years. Because petitioner has not asked the Court to vacate this stipulation, and the record does not otherwise give us any reason to qualify, change, or contradict it, we treat the stipulation as a conclusive admission by petitioner that petitioner bears the burden of proof for both years. See Rule 91(e).

We read the license agreement to provide specifically that Nordic was licensing the Software to Vision and that Vision could sublicense the Software to FoxVideo. The agreement, for example, granted Vision "an exclusive perpetual worldwide license" to use the Software and allowed Vision to sublicense the Software to FoxVideo for its use. The agreement also stated that the license to Vision "is not a sale", that "Except as otherwise provided herein, title and all proprietary rights (patents, trade secrets, copyrights and trade marks) to the Software, and any copy made by Vision are held by Nordic", and that the "Software is copyrighted and is protected by United States and International Copyright Laws." Petitioner makes no mention of these quoted statements, or the fact that the parties to the license agreement went to great lengths to include them within that agreement. Nor does petitioner explain how Vision could have sold the Software to FoxVideo when the Software was not owned, but merely licensed, by Vision. Indeed, petitioner does not even rebut the fact that Nordic licensed the Software to Vision and specifically acknowledges this fact when petitioner states that the license agreement resulted in Vision's having a license to use the Software.

We also read the Vision agreement to provide similarly that Vision licensed and did not sell the Software to FoxVideo. This agreement states that Vision sublicensed the Software to FoxVideo

and that Vision would be receiving the $3 million and $1.75 million payments in dispute as a "License Fee". This agreement also labeled the transaction underlying the payments a "Grant of License" and referenced the license agreement as an integral part of the Vision agreement by stating that "The continuing existence and validity of Vision's license of the Nordic Software from Nordic * * * shall be of the essence of the Vision agreement" and that "The Vision Software License shall have a term coextensive with the Term of the Vision agreement".

We conclude that the transaction was a licensing agreement and, hence, that the disputed payments are taxable as ordinary income.[1] We have considered all arguments made by the parties as to this conclusion and have found those arguments not discussed herein to be irrelevant and/or without merit. We have not considered the alternative arguments which respondent made in the event that we were to conclude that the subject transaction was not a licensing agreement. To reflect concessions,

Decision will be entered
under Rule 155.

---

[1] We also believe that the reimbursement provision of the Vision agreement is more consistent with our finding of a licensing agreement as opposed to a sale. Whereas petitioner asserts that the useful life of the subject property was less than 4 years, we find that the parties to the Vision agreement believed at the time of that agreement that the property's useful life was 5 years or more.