T.C. Memo. 2009-191

UNITED STATES TAX COURT

JOSEPH A. AND JUDITH FREDA, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12874-07, 16255-07,    Filed August 25, 2009.
          16256-07, 16257-07,
          16258-07, 16259-07,
          16260-07, 16261-07,
          16262-07.

<u>Jenny L. Johnson</u> and <u>Ziemowit T. Smulkowski</u>, for petition-
ers.

<u>John J. Comeau</u> and <u>Kathleen C. Schlenzig</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated here-
with:  Mark N. Freda, docket No. 16255-07; Joseph M. and Victoria
A. Freda, docket No. 16256-07; Michael F. Maude, Jr., and Maria
E. Maude, docket No. 16257-07; Michael R. and Kathryn A. Newcome,
docket No. 16258-07; Dennis J. and Mary Ann Olson, docket No.
16259-07; Matthew J. Olson, docket No. 16260-07; Michael and Lynn
Slaboch Olson, docket No. 16261-07; and Michael P. and Christine
Stock, docket No. 16262-07.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined for taxable year 2002 deficiencies in Federal income tax (tax) as follows:

| Petitioner(s) | Deficiency |
|---|---|
| Joseph A. and Judith Freda | $754,606 |
| Mark N. Freda | 23,983 |
| Joseph M. and Victoria A. Freda | 33,246 |
| Michael F. Maude, Jr., and Maria E. Maude | 373 |
| Michael R. and Kathryn A. Newcome | 68,084 |
| Dennis J. and Mary Ann Olson | 666,099 |
| Matthew J. Olson | 54,425 |
| Michael and Lynn Slaboch Olson | 53,601 |
| Michael P. and Christine Stock | 28,226 |

The issue remaining for decision for taxable year 2002 is whether the amount that Pizza Hut, Inc. (Pizza Hut), paid to C&F Packing Co., Inc. (C&F), during 2002 in settlement of certain claims of C&F against Pizza Hut is long-term capital gain or ordinary income to C&F.[2]  We hold that that amount is ordinary income.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time petitioners, except Mark N. Freda, filed their respective petitions, they resided in Illinois.  At the time petitioner Mark N. Freda filed his petition, he resided in Washington.

_____

[2]As discussed below, for taxable year 2002 C&F was an S corporation, the income of which flowed through to its stockholders, certain petitioners herein (stockholder petitioners).

At all relevant times, including during 2002, petitioners Joseph A. Freda, Mark N. Freda, Joseph M. Freda, Maria E. Maude, Kathryn A. Newcome, Mary Ann Olson, Matthew J. Olson, Michael Olson, and Christine Stock were stockholders of C&F.[3]

At all relevant times, C&F, a corporation organized in Illinois that maintained its principal place of business in that State, made and sold a variety of meats, including sausage. At those times, C&F was an S corporation.

Since the early 1970s, C&F supplied uncooked sausage to pizza vendors, including Pizza Hut. In 1984, after several years of work, C&F succeeded in developing a process (C&F process) for making precooked sausage that had the appearance and taste of home-cooked sausage. In 1985, C&F applied for, and later obtained, a patent (C&F process patent) on the C&F process.[4] Thereafter, C&F continued to improve the C&F process. C&F treated as a trade secret (C&F trade secret) the information relating to (1) the C&F process and (2) the improvements made to that process after obtaining the C&F process patent.

_____

[3]Petitioners Judith Freda, Victoria A. Freda, Michael F. Maude, Jr., Michael R. Newcome, Dennis J. Olson, Lynn Slaboch Olson, and Michael P. Stock are petitioners in their respective cases solely because each filed a joint tax return with his or her spouse, who was a stockholder of C&F during 2002.

[4]C&F also obtained a separate patent on an apparatus that was specially designed for use in the C&F process.

Around 1985, Pizza Hut expressed an interest in using nationwide sausage made with the C&F process. On July 18, 1985, certain executives of Pizza Hut (Pizza Hut executives) and certain executives of C&F (C&F executives) met to discuss Pizza Hut's interest in the C&F process (July 18, 1985 meeting). During that meeting, the Pizza Hut executives informed the C&F executives that Pizza Hut was willing to enter into a contract with C&F under which Pizza Hut was to purchase from C&F sausage made using the C&F process only if C&F was willing to share the C&F process with other Pizza Hut suppliers. During the July 18, 1985 meeting, the C&F executives countered that C&F was willing to share the C&F process with other Pizza Hut suppliers only if C&F was to receive a royalty on all sales of sausage made with that process. The Pizza Hut executives rejected that counterproposal with an offer that Pizza Hut and C&F enter into a long-term supply contract under which Pizza Hut was to purchase from C&F one-half of its total sausage needs, with a guaranteed floor of at least 200,000 pounds of sausage per week. During the July 18, 1985 meeting, the Pizza Hut executives also insisted that any such supply contract between Pizza Hut and C&F include an agreement by C&F not to license the C&F process, or to sell sausage made with that process, to certain major competitors of Pizza Hut.

On August 5, 1985, Pizza Hut and C&F executed a document entitled "CONFIDENTIAL DISCLOSURE AGREEMENT" (Pizza Hut confidentiality agreement). That document required, inter alia, C&F to disclose to Pizza Hut "confidential information relating to the meat product, process and apparatus invention as we [C&F] believe will be required to enable you [Pizza Hut] to evaluate the same." The Pizza Hut confidentiality agreement further required, inter alia, Pizza Hut (1) to keep confidential the information that C&F disclosed to Pizza Hut, (2) not to disclose that information to any person not employed by Pizza Hut without the written consent of C&F, and (3) not to use that information for the benefit of any person or entity except Pizza Hut without the written consent of C&F. Pursuant to the Pizza Hut confidentiality agreement, C&F disclosed to Pizza Hut the C&F process and all improvements made to that process after C&F obtained the C&F process patent.

Around late 1985, C&F also entered into certain agreements (third-party confidentiality agreements) with the following four suppliers of Pizza Hut (Pizza Hut's third-party suppliers): H&M Food Systems Co., Standard Meat Co., Doskocil Cos., Inc., and Parks Sausage. Each of those agreements required C&F to disclose "confidential information relating to the meat product, process and apparatus invention as C and F believes will be required to enable * * * [Pizza Hut's third-party supplier] to operate the same and to make patented and know-how product." Pursuant to the

third-party confidentiality agreements, Pizza Hut's third-party suppliers were (1) to maintain confidentiality with respect to the information that C&F disclosed to them and (2) not to disclose that information to, or use it for the benefit of, anyone else without the written consent of C&F.

Pursuant to the third-party confidentiality agreements, C&F shared the C&F trade secret with Pizza Hut's third-party suppliers. By at least early 1986 all of those suppliers had duplicated the C&F process and were selling sausage made with that process to Pizza Hut. Thereafter, Pizza Hut extracted from C&F certain price reductions for the sausage that it was purchasing from C&F and pressured C&F into incurring substantial expenditures on its behalf. In reliance on the discussions at the July 18, 1985 meeting and the prospect of a significant supply contract with Pizza Hut, C&F (1) purchased and refurbished at substantial cost a new production facility, (2) incurred the cost of correcting the deficiencies in certain substandard products that other companies produced for Pizza Hut, and (3) incurred the cost of operating a C&F production facility to assist Pizza Hut in the development of new products, such as a bacon pizza topping.

Although C&F undertook certain actions in reliance on the discussions at the July 18, 1985 meeting, including those described above, Pizza Hut did not enter into a long-term supply

contract with C&F, as the Pizza Hut executives had promised to do at that meeting. Nor did Pizza Hut's weekly purchases of sausage from C&F after the July 18, 1985 meeting through early 1993 reach 200,000 pounds, as those executives had also promised at that meeting.

Starting around 1989, when IBP, Inc. (IBP), was one of Pizza Hut's largest suppliers of meat products other than sausage, Pizza Hut disclosed the C&F trade secret to that company without having informed C&F or acquired its consent. Thereafter, IBP replicated the C&F process and began to sell to Pizza Hut sausage made with that process, and Pizza Hut began to buy less sausage from C&F.

Around late 1992 or early 1993, C&F began to suspect that IBP was using the C&F process. In early 1993, C&F confirmed its suspicions when IBP allowed C&F's attorneys to inspect IBP's manufacturing facility.

On March 17, 1993, C&F filed a complaint against IBP in the U.S. District Court for the Northern District of Illinois (District Court) in which it alleged that IBP had infringed the C&F process patent. (We shall refer to the proceeding that C&F initiated in the District Court as the C&F lawsuit.) On the same date, C&F sent Pizza Hut a letter in which it informed Pizza Hut about the C&F lawsuit. Shortly thereafter, Pizza Hut stopped purchasing sausage from C&F and terminated C&F as a supplier. On

March 22, 1993, C&F amended its complaint in the C&F lawsuit and added a claim against Pizza Hut for inducement of patent infringement.

On May 14, 1993, C&F filed a second amended complaint in the C&F lawsuit (second amended complaint). In that complaint, C&F alleged (1) fraud against Pizza Hut (Pizza Hut fraud count), (2) breach of fiduciary duty against Pizza Hut (Pizza Hut breach of fiduciary duty count), (3) unfair competition against Pizza Hut (Pizza Hut unfair competition count), (4) unjust enrichment against Pizza Hut (Pizza Hut unjust enrichment count), (5) patent infringement against both Pizza Hut and IBP (Pizza Hut and IBP patent infringement count), (6) tortious interference with business expectancy against IBP (IBP tortious interference count), (7) unfair competition against IBP (IBP unfair competition count), and (8) misappropriation of trade secrets against Pizza Hut in violation of the Illinois Trade Secrets Act (Pizza Hut misappropriation count). As part of the Pizza Hut misappropriation count, C&F alleged:

> 1-54. C&F restates Paragraphs 1 through 54 of Count I as Paragraphs 1 through 54 of Count VIII.
>
> 55. The confidential information which C&F entrusted to Pizza Hut included trade secrets protected by the Illinois Trade Secrets Act, 75 ILCS 1065/1, et seq.
>
> 56. Pizza Hut misappropriated such trade secrets by, among other things: (a) acquiring the trade secrets through fraudulent misrepresentations and omissions, and (b) disclosing and using such trade secrets,

after notice, without express or implied consent of C&F.

57.   As a result, C&F has been damaged, and has suffered, among other things, lost profits, lost opportunities, operating losses and expenditures.

58.   Pizza Hut's misappropriation was willful and malicious.[5]

### Prayer For Relief

WHEREFORE, C&F asks this Court to enter judgment against Pizza Hut for the following relief:

(a)   An award of compensatory damages in an amount to be determined at trial;

(b)   An award of punitive damages in an amount to be determined at trial;

(c)   An injunction prohibiting Pizza Hut's future use and disclosure of C&F's trade secrets;

(d)   An award of C&F's reasonable attorney's fees; and

(e)   Such other and further relief as this Court and/or jury may deem proper and just.

In a memorandum opinion and order filed on February 1, 1994 (February 1, 1994 opinion and order), the District Court granted Pizza Hut's motion to dismiss the following counts in the second amended complaint:  The Pizza Hut fraud count, the Pizza Hut breach of fiduciary duty count, the Pizza Hut unfair competition

---

[5]Paragraph Nos. 1-54, 55, 56, 57, and 58 in the Pizza Hut misappropriation count are also used in the Pizza Hut breach of fiduciary duty count.  Any reference hereinafter to paragraph 1-54, 55, 56, 57, or 58 of the second amended complaint is to the paragraph number in the Pizza Hut misappropriation count.

count, the Pizza Hut unjust enrichment count, and the Pizza Hut misappropriation count.

On February 28, 1997, pursuant to a document entitled "SHAREHOLDER REDEMPTION AGREEMENT" (redemption agreement), C&F redeemed the C&F stock held by Gerald Freda (redeemed stockholder). The redemption agreement provided that the redeemed stockholder was to tender to C&F all of his C&F stock in exchange for certain consideration that C&F was to provide to him, including a one-third interest in the C&F lawsuit.

In a report and recommendation filed on March 16, 1998 (March 16, 1998 report), a U.S. magistrate judge of the District Court (magistrate judge) recommended that that court grant IBP's motion for summary judgment with respect to the IBP tortious interference count and the IBP unfair competition count. In the March 16, 1998 report, the magistrate judge also recommended that the District Court deny IBP's motion for summary judgment with respect to a claim against IBP for misappropriation of trade secrets (IBP misappropriation count). On a date not disclosed by the record, the District Court accepted the magistrate judge's recommendations and dismissed the IBP tortious interference count and the IBP unfair competition count and denied IBP's motion for summary judgment with respect to the IBP misappropriation count.

In an opinion filed on March 31, 1998, the District Court held that the C&F process patent was invalid.  As a result, that court granted the respective motions for summary judgment that IBP and Pizza Hut had filed with respect to the Pizza Hut and IBP patent infringement count.

In December 1998, the District Court conducted a jury trial with respect to the IBP misappropriation count.  On December 9, 1998, the jury returned a verdict in favor of C&F on that count and awarded it $10,939,391 in damages based on a theory of unjust enrichment.  Thereafter, the District Court (1) awarded to C&F prejudgment interest on the jury's damages award and (2) denied IBP's posttrial motions for (a) judgment as a matter of law, (b) a new trial, and (c) remittitur (posttrial motions).

IBP appealed the District Court's judgment awarding C&F prejudgment interest and denying its posttrial motions.  C&F appealed the District Court's judgment reflecting its February 1, 1994 opinion and order dismissing the Pizza Hut fraud count, the Pizza Hut breach of fiduciary duty count, the Pizza Hut unfair competition count, the Pizza Hut unjust enrichment count, and the Pizza Hut misappropriation count.

In an opinion filed on August 25, 2000 (Court of Appeals opinion), the U.S. Court of Appeals for the Federal Circuit (Court of Appeals) affirmed the District Court's denial of IBP's posttrial motions and affirmed that court's award of $10,939,391

in damages with respect to the IBP misappropriation count. The Court of Appeals also affirmed the District Court's dismissal of the Pizza Hut fraud count, the Pizza Hut breach of fiduciary duty count, the Pizza Hut unfair competition count, and the Pizza Hut unjust enrichment count. However, the Court of Appeals reversed the District Court's award of prejudgment interest to C&F. The Court of Appeals also reversed the District Court's dismissal of the Pizza Hut misappropriation count, reinstated that count, and remanded the case to the District Court for further proceedings. After the Court of Appeals opinion, the only unsettled claim in the C&F lawsuit was the Pizza Hut misappropriation count.

At a time during 2000 after the Court of Appeals affirmed the District Court's award with respect to the IBP misappropriation count, IBP paid to C&F $10,939,391 (IBP payment), which equaled the damages that the District Court awarded to C&F consistent with the jury's verdict on the IBP misappropriation count. Of that $10,939,391, C&F (1) paid $4,922,726 to its attorneys Niro, Scavone, Haller & Niro (Niro law firm), (2) paid $2,005,555, or one-third of the balance after its payment to the Niro law firm, to the redeemed stockholder, and (3) retained

$4,011,110, or two-thirds of the balance after its payment to the Niro law firm.[6]

At a time not disclosed by the record after August 25, 2000, and before January 12, 2001, Pizza Hut filed a motion for summary judgment with respect to the Pizza Hut misappropriation count. In a memorandum opinion and order filed on January 12, 2001, the District Court denied that motion.

On January 28, 2002, C&F, petitioner Joseph A. Freda, petitioner Dennis J. Olson, the redeemed stockholder, and Pizza Hut entered into an agreement entitled **<u>SETTLEMENT AGREEMENT AND RELEASE</u>**" (settlement agreement).[7] That agreement provided in pertinent part:

---

[6]C&F filed Form 1120S, U.S. Income Tax Return for an S Corporation (Form 1120S), for taxable year 2000 (2000 S corporation return). In that return, C&F reported the following with respect to the IBP payment: (1) $2,936,936 as "Net section 1231 gain (loss)" and (2) $1,047,279 as "Net gain (loss) from Form 4797, Part II, line 18". C&F included with the 2000 S corporation return Form 4797, Sales of Business Property. In Form 4797, Part I, Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft - Most Property Held More Than 1 Year, C&F reported $2,963,831 as a gain from a "TRADE SECRET SALE". In that part of that form, C&F also reported $26,895 as a loss from the sale of "MACHINERY & EQUIPMENT", resulting in a net gain of $2,936,936. In Form 4797, Part II, Ordinary Gains and Losses, C&F reported $1,047,279 as a gain from a "LOST PROFIT SETTLEMENT".

[7]We shall refer collectively to C&F, petitioner Joseph A. Freda, petitioner Dennis J. Olson, and the redeemed stockholder, all of whom entered into the settlement agreement with Pizza Hut, as the C&F parties.

## I. RECITALS

1.1 C&F has asserted claims against Pizza Hut for damages as set forth in an Amended Complaint, Second Amended Complaint and subsequent pleadings filed in the action entitled <u>C&F Packing Co., Inc. v. Pizza Hut, Inc.</u>, No. 93 C 1601, United States District Court for the Northern District of Illinois (hereinafter referred to as "the Lawsuit").

1.2 The C&F Parties and Pizza Hut desire to enter into this Agreement in order to provide for a lump-sum payment in full and complete discharge and settlement of the Lawsuit and all other past, present and future claims that could be asserted now or in the future by the C&F Parties and Pizza Hut related to the events and circumstances described in the Lawsuit, upon the terms and conditions set forth herein, without the necessity of proceeding with a trial on the merits, and all without admission of liability or wrongdoing on the part of Pizza Hut.

## II. PAYMENT

In consideration of the dismissal with prejudice of the Lawsuit, and the release, representations, warranties and the remaining promises set forth in this Agreement, Pizza Hut agrees to make a cash payment in the amount of $15,300,000.00 (fifteen million three hundred thousand dollars and zero cents) payable to "C&F Packing Co., Inc. and its attorneys, Niro, Scavone, Haller & Niro" on or before February 6, 2002 by wire transfer * * *

## III. AGREEMENTS RESPECTING
## PRESENT AND FUTURE CLAIMS AND CAUSES OF ACTION

In consideration of the above payment, and release and dismissal, the parties agree to the following:

3.1 <u>Dismissal with Prejudice</u>. Within two (2) days of receipt of the payment required by this Agreement, C&F's attorneys shall file with the Court an agreed-to order dismissing the Lawsuit with prejudice in the form attached hereto as Exhibit A.

3.2 <u>Release</u>. The C&F Parties and Pizza Hut mutually release and forever discharge one another,

their predecessors and successors in interest, assignees, nominees, and their past, present and future parents, subsidiaries, affiliates, divisions, officers, directors, employees, stockholders, attorneys, servants, representatives, partners and agents, as well as all of the subsidiaries, divisions, affiliates, directors, officers, agents, employees, attorneys, heirs, executors administrators and assignees of all those persons and entities (hereinafter all collectively referred to as the "Released Parties"), of and from any and all past, present or future claims, obligations, actions, or causes of action (however denominated) for any injury, damage or loss arising directly or indirectly from Pizza Hut's relationship with C&F as a Pizza Hut product supplier, including, but not in any sense limited to, all claims and allegations that were or that could have been asserted in the Lawsuit. The C&F Parties and Pizza Hut intend for the Released Parties that are not parties to this Agreement to be third-party beneficiaries of the release provided for by this paragraph.

3.3 <u>Covenant Not to Sue</u>. The C&F Parties and Pizza Hut agree not to, at any time, sue, institute or assist in instituting a proceeding in any court or forum, alleging any claim that is covered by the release in Paragraph 3.2 of this Agreement.

3.4 The C&F Parties and Pizza Hut acknowledge that the payment called for by this Agreement is being made to compromise and settle claims disputed as to both liability and amount, and is being made to C&F in settlement and release of all past, present and/or future claims against any of the Pizza Hut Released Parties. Neither payment of the sum reflected herein nor any statements or communications made by Pizza Hut or its agents during the negotiations leading to this Agreement shall be considered admissions of liability by or on behalf of any of them.

3.5 The C&F Parties and Pizza Hut acknowledge that this Agreement is intended to terminate any claims by them against the Released Parties and to bar any future litigation between the parties hereto and that there is no agreement by Pizza Hut to make any payment or to do any act or thing other than as expressly stated herein.

Pursuant to section II of the settlement agreement, Pizza Hut issued a check for $15,300,000 (Pizza Hut payment) that was payable to C&F and the Niro law firm and sent that check to that firm. The Niro law firm (1) retained $6,120,000 of the Pizza Hut payment as legal fees and expenses and (2) distributed on February 5, 2002, (a) one-third of the balance, or $3,060,000, to the redeemed stockholder and (b) two-thirds of the balance, or $6,120,000, to C&F.

C&F filed Form 1120S for taxable year 2002 (2002 S corporation return). In that return, C&F reported a net long-term capital gain of $6,112,347 (C&F's net long-term capital gain). C&F included with the 2002 S corporation return Schedule D, Capital Gains and Losses and Built-In Gains (2002 S corporation Schedule D). In that schedule, C&F's net long-term capital gain included a gain of $6,120,000 from a "TRADE SECRET SALE" and a loss of $7,653 from a "LONG TERM STOCK SALE". The $6,120,000 that C&F reported as a "TRADE SECRET SALE" in the 2002 S corporation Schedule D is equal to the amount of the Pizza Hut payment that the Niro law firm distributed to C&F on February 5, 2002. In the 2002 S corporation return, C&F also reported an ordinary loss from trade or business activities of $3,367,961 (C&F's ordinary loss).

C&F issued to each stockholder petitioner Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc. (2002

Schedule K-1), for taxable year 2002. In each of those Schedules K-1, C&F reported as net long-term capital gain the stockholder petitioner's proportionate share of C&F's net long-term capital gain, which included the $6,120,000 that C&F reported as gain from a "TRADE SECRET SALE" in the 2002 S corporation Schedule D. In each 2002 Schedule K-1, C&F also reported as an ordinary loss from trade or business activities the stockholder petitioner's proportionate share of C&F's ordinary loss.

Petitioners or petitioner, as the case may be, in each of these cases filed Form 1040, U.S. Individual Income Tax Return, for taxable year 2002 that included Schedule D, Capital Gains and Losses (2002 Schedule D), and Schedule E, Supplemental Income and Loss (2002 Schedule E). Those respective 2002 Schedules D showed as net long-term gain the stockholder petitioners' respective proportionate shares of C&F's net long-term capital gain, as reported in the respective 2002 Schedules K-1 that C&F issued to them.[8] The respective 2002 Schedules E showed as nonpassive

_____

[8]In their respective 2002 Schedules D, stockholder petitioners Maria E. Maude, Kathryn Newcome, and Michael Olson reported amounts of net long-term capital gain that flowed through to them that were different from the amounts of net long-term capital gain that C&F reported in the respective 2002 Schedules K-1 that it issued to them. The record does not explain those differences. In any event, the amounts of net long-term capital gain that C&F reported in the respective 2002 Schedules K-1 that it issued to stockholder petitioners Maria E. Maude, Kathryn Newcome, and Michael Olson reflected their respective proportionate shares of C&F's net long-term capital gain reported in the 2002 S corporation Schedule D.

losses from C&F the stockholder petitioners' respective proportionate shares of C&F's ordinary loss, as reported in the respective 2002 Schedules K-1 that C&F issued to them.[9]

Respondent issued respective notices of deficiency for taxable year 2002 to petitioners in these cases (2002 notices). In the 2002 notices, respondent determined that the amount that Pizza Hut paid to C&F during 2002 pursuant to the settlement agreement is ordinary income, and not long-term capital gain, to C&F for that year.  In those notices, respondent also determined that the $3,060,000 that the Niro law firm distributed to the redeemed stockholder on February 5, 2002, is ordinary income to C&F.[10]  As a result of those determinations, respondent further determined to (1) decrease the amount of long-term capital gain reported in the 2002 Schedules D and (2) increase the amount of ordinary income reported in the 2002 Schedules E.

---

[9]In their respective 2002 Schedules E, stockholder petitioners Joseph M. Freda and Maria E. Maude reported amounts of ordinary loss that flowed through to them that were different from the amounts of ordinary loss that C&F reported in the respective 2002 Schedules K-1 that it issued to them.  The record does not explain those differences.  In any event, the amounts of ordinary loss that C&F reported in the respective 2002 Schedules K-1 that it issued to stockholder petitioners Joseph M. Freda and Maria E. Maude reflected their respective proportionate shares of C&F's ordinary loss reported in the 2002 S corporation return.

[10]Respondent concedes the issue involving the redeemed stockholder.  That is because in the event the Court were to hold that the $3,060,000 that the Niro law firm distributed to that stockholder is includible in C&F's income for 2002, respondent would concede that C&F is entitled to a deduction in an equal amount for that year.

OPINION

Petitioners bear the burden of establishing that the amount that Pizza Hut paid to C&F pursuant to the settlement agreement (amount at issue) is long-term capital gain, and not ordinary income, to C&F for taxable year 2002 that flows through proportionately to its respective stockholder petitioners for that year.[11]  See Rule 142(a);[12] Welch v. Helvering, 290 U.S. 111, 115 (1933).

It is petitioners' position that the amount at issue is long-term capital gain to C&F for taxable year 2002.  In support of that position, petitioners advance three alternative arguments.  According to petitioners, Pizza Hut paid the amount at issue for:  (1) Damage to the C&F trade secret, a capital asset in C&F's hands (petitioners' principal argument); (2) C&F's sale or exchange of the C&F trade secret to Pizza Hut; or (3) the termination of C&F's rights under the Pizza Hut confidentiality agreement with respect to the C&F trade secret.

We turn first to petitioners' principal argument.  In support of that argument, petitioners assert, and respondent does not dispute, that "The taxability of the proceeds of a lawsuit,

---

[11]Petitioners do not claim that the burden of proof shifts to respondent under sec. 7491(a).

[12]All Rule references are to the Tax Court Rules of Practice and Procedure.  All section references are to the Internal Revenue Code (Code) in effect for the year at issue.

or of a sum received in settlement thereof, depends upon the nature of the claim and the actual basis of recovery." Sager Glove Corp. v. Commissioner, 36 T.C. 1173, 1180 (1961), affd. 311 F.2d 210 (7th Cir. 1962); see also Tribune Publg. Co. v. United States, 836 F.2d 1176, 1178 (9th Cir. 1988); Canal-Randolph Corp. v. United States, 568 F.2d 28, 33 (7th Cir. 1977). Where the recovery represents damages for lost profits or other items taxed as ordinary income, it is taxable as ordinary income. See Hort v. Commissioner, 313 U.S. 28, 31 (1941); State Fish Corp. v. Commissioner, 48 T.C. 465, 473 (1967). Where the recovery represents damages for injury to, or destruction of, a capital asset, it is taxable as capital gain to the extent that it exceeds the taxpayer's basis in the asset.[13] See Wheeler v. Commissioner, 58 T.C. 459, 461 (1972); State Fish Corp. v. Commissioner, supra at 473.

The parties do not dispute that the only claim outstanding against Pizza Hut at the time Pizza Hut and the C&F parties entered into the settlement agreement was the Pizza Hut misappropriation claim. Nor do they dispute that a trade secret, like the C&F trade secret, is a capital asset. See Ofria v. Commissioner, 77 T.C. 524, 541-542 (1981). The parties' dispute is

---

[13]To the extent that the recovery does not exceed the taxpayer's basis in the capital asset, it is a return of capital and not taxable. See, e.g., State Fish Corp. v. Commissioner, 48 T.C. 465, 473 (1967). Petitioners do not claim that the amount at issue is not taxable.

whether the amount at issue that Pizza Hut paid to C&F represented damages for injury to, or destruction of, the C&F trade secret.

Petitioners maintain that "the value of * * * [the C&F trade secret] was the right to a competitive advantage by using a process unknown to others" and that "Pizza Hut destroyed * * * [the C&F trade secret] when it disclosed * * * [that trade secret] to IBP and terminated C&F as a supplier." From those premises, petitioners conclude:

> The amount paid by Pizza Hut to settle C&F's claim for misappropriation of trade secrets is, therefore, properly treated as capital gain because "amounts received for injury or damage to capital assets are taxable as capital gain." Inco [Electroenergy Corp. v. Commissioner], T.C. Memo[. 1987] * * *-437; State Fish [Corp. v. Commissioner], * * * [supra] at 472.

Petitioners' conclusion does not logically follow from the premises on which it is based. It also disregards the fundamental principle, with which petitioners agree, that the tax treatment of the amount at issue "depends upon the nature of the claim and the actual basis of recovery." Sager Glove Corp. v. Commissioner, supra at 1180.

In the Pizza Hut misappropriation count, C&F alleged in pertinent part:

> 56. Pizza Hut misappropriated such trade secrets by, among other things: (a) acquiring the trade secrets through fraudulent misrepresentations and omissions, and (b) disclosing and using such trade secrets, after notice, without express or implied consent of C&F.

57. As a result, C&F has been damaged, and has suffered, among other things, lost profits, lost opportunities, operating losses and expenditures.

Petitioners argue that C&F's allegations in paragraph 57 of the Pizza Hut misappropriation count specified "lost profits, lost opportunities, operating losses and expenditures" solely as a measure of Pizza Hut's injury to, or destruction of, the C&F trade secret.[14] Those allegations in that paragraph belie that argument.[15] C&F alleged in paragraph 57 of the Pizza Hut misappropriation count that, as a result of Pizza Hut's misappropriation of the C&F trade secret alleged in paragraph 56 of that count, C&F had been damaged and had suffered "among other things,

_____

[14]Petitioners also argue that C&F could not have recovered, and did not recover, any lost profits from Pizza Hut because it recovered lost profits from IBP as a result of the judgment of the District Court, which was based upon a jury verdict and which the Court of Appeals affirmed, that IBP was to pay C&F $10,939,391 in damages with respect to the IBP misappropriation count. That argument assumes that any profits that C&F may have lost which were attributable to IBP's misappropriation of the C&F trade secret were the same as any profits that C&F may have lost which were attributable to Pizza Hut's alleged misappropriation of that trade secret. On the record before us, we reject petitioners' argument and the assumption on which it is based. On that record, we find that petitioners have failed to carry their burden of establishing that any lost profits of C&F that were attributable to IBP's misappropriation of the C&F trade secret were the same as any lost profits of C&F that were attributable to Pizza Hut's alleged misappropriation of that trade secret.

[15]C&F's allegations in paragraph 57 of the Pizza Hut misappropriation count also belie any suggestion in the uncorroborated testimony on which we are unwilling to rely of the president of C&F, petitioners' only witness at trial, that Pizza Hut did not pay the amount at issue to C&F as damages for C&F's lost profits and the other items specified in that paragraph.

lost profits, lost opportunities, operating losses and expendi-
tures." On the record before us, we find that petitioners have
failed to carry their burden of establishing that C&F specified
in paragraph 57 of the Pizza Hut misappropriation count "lost
profits, lost opportunities, operating losses and expenditures"
and other unidentified items covered by "among other things"
solely as a measure of Pizza Hut's injury to, or destruction of,
the C&F trade secret. On that record, we find that C&F asserted
a claim in paragraph 57 of the Pizza Hut misappropriation count
for the items specified therein as the damage to and the suffer-
ing of C&F resulting from Pizza Hut's alleged misappropriation of
the C&F trade secret. On the record before us, we further find
that petitioners have failed to carry their burden of establish-
ing that the damages that C&F claimed in the Pizza Hut misappro-
priation count were for injury to, or destruction of, the C&F
trade secret. On that record, we find that in settlement of
C&F's claim in the Pizza Hut misappropriation count, which was
the only claim outstanding against Pizza Hut at the time of the
execution of the settlement agreement, Pizza Hut paid the amount
at issue to C&F for "lost profits, lost opportunities, operating
losses and expenditures".[16] On the record before us, we find

---

[16]Pizza Hut and the C&F parties entered into the settlement
agreement

(continued...)

that petitioners have failed to carry their burden of establishing that that amount did not represent damages for lost profits or other items taxed as ordinary income.[17]  On that record, we find that petitioners have failed to carry their burden of establishing that the amount at issue is long-term capital gain to C&F for taxable year 2002 under petitioners' principal argument.

We turn next to petitioners' alternative argument that the amount at issue is long-term capital gain to C&F for taxable year 2002 because it represents gain from C&F's sale or exchange during that year of the C&F trade secret to Pizza Hut.

Pursuant to section 1222, a "sale or exchange" of a capital asset is a prerequisite to capital gain treatment.  See <u>Dobson v.</u>

---

[16](...continued)
in order to provide for a lump-sum payment in full and complete discharge and settlement of the [C&F] Lawsuit and all other past, present and future claims that could be asserted now or in the future by the C&F Parties and Pizza Hut related to the events and circumstances described in the [C&F] Lawsuit * * *.

[17]As discussed above, C&F claimed in paragraph 57 of the Pizza Hut misappropriation count that C&F had been damaged and had suffered not only "lost profits" but also "lost opportunities, operating losses and expenditures."  On the record before us, we find that petitioners have failed to carry their burden of establishing what "lost opportunities, operating losses and expenditures" C&F had suffered that would result in long-term capital gain, and not ordinary income, to C&F for taxable year 2002.  Assuming arguendo that petitioners had carried that burden, on the record before us, we would find that petitioners have failed to carry their burden of establishing the portion of the amount at issue that is long-term capital gain to C&F for that year.

<u>Commissioner</u>, 321 U.S. 231, 231-232 (1944). Since the Code does not define the words "sale" and "exchange" for purposes of section 1222, we shall give those words their ordinary meaning. See <u>Helvering v. William Flaccus Oak Leather Co.</u>, 313 U.S. 247, 249 (1941). A sale is "'a transfer of property for a fixed price in money or its equivalent'". <u>Commissioner v. Brown</u>, 380 U.S. 563, 571 (1965) (quoting <u>Iowa v. McFarland</u>, 110 U.S. 471, 478 (1884)). An exchange occurs when "property is transferred in return for other property". <u>Spalding v. Commissioner</u>, 7 B.T.A. 588, 590 (1927); see also <u>Guest v. Commissioner</u>, 77 T.C. 9, 24 (1981).

In determining whether a transfer of rights in a trade secret constitutes a sale of the trade secret, courts generally have applied the tests developed in the context of a transfer of a patent. See <u>Pickren v. United States</u>, 378 F.2d 595, 599 (5th Cir. 1967); <u>PPG Indus., Inc. v. Commissioner</u>, 55 T.C. 928, 1012 (1970). Section 1235(a) provides in pertinent part that "A transfer * * * of property consisting of all substantial rights to a patent * * * shall be considered the sale or exchange of a capital asset held for more than 1 year". Thus, in order for the transfer of a trade secret to qualify as a sale or exchange, the owner of the trade secret must transfer "all substantial rights" to it. See <u>Vision Info. Servs., L.L.C. v. Commissioner</u>, 419 F.3d 554, 561 (6th Cir. 2005), affg. T.C. Memo. 2004-53. For purposes

of section 1235, the term "all substantial rights" means "all rights * * * which are of value at the time the rights * * * are transferred."  Sec. 1.1235-2(b)(1), Income Tax Regs.  In the context of a trade secret, the most significant rights held by its owner are the rights to prevent the unauthorized use and the unauthorized disclosure of the secret.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1011 (1984); E.I. Du Pont De Nemours & Co. v. United States, 153 Ct. Cl. 274, 288 F.2d 904, 911 (1961); Stalker Corp. v. United States, 209 F. Supp. 30, 34 (E.D. Mich. 1962).

On the record before us, we find that under the settlement agreement C&F did not transfer to Pizza Hut any rights, let alone the most significant rights, to the C&F trade secret, viz., the rights to prevent the unauthorized use and the unauthorized disclosure of that trade secret.  On that record, we further find Pizza Hut did not pay the amount at issue under the settlement agreement for C&F's sale or exchange of the C&F trade secret to Pizza Hut.  On the record before us, we find that petitioners have failed to carry their burden of establishing that under section 1222 the amount at issue is long-term capital gain to C&F for taxable year 2002.

We turn finally to petitioners' alternative argument that the amount at issue is capital gain to C&F for taxable year 2002 because Pizza Hut paid that amount for the termination of the

rights of C&F under the Pizza Hut confidentiality agreement with respect to the C&F trade secret.  In support of that argument, petitioners rely on section 1234A.

Section 1234A provides in pertinent part:

SEC. 1234A.  GAINS OR LOSSES FROM CERTAIN TERMINATIONS.

   Gain or loss attributable to the cancellation, lapse, expiration, or other termination of--

      (1) a right or obligation * * * with respect to property which is * * * a capital asset in the hands of the taxpayer, * * *

   *       *       *       *       *       *       *

shall be treated as gain or loss from the sale of a capital asset. * * *

Petitioners argue that the Pizza Hut confidentiality agreement gave to C&F the rights to require Pizza Hut to (1) keep the C&F trade secret confidential, (2) refrain from using that trade secret except for purposes of evaluating the sausage product, and (3) return all materials relating to the trade secret.  According to petitioners, the settlement agreement terminated those contractual rights.  In support of that assertion, C&F maintains that in the settlement agreement

> C&F released Pizza Hut from any claims or obligations for "any injury, damage or loss arising directly or indirectly from Pizza Hut's relationship with C&F as a Pizza Hut Product Supplier." * * * After entering into the Settlement Agreement, C&F could not pursue any claims and Pizza Hut had no obligations arising from Pizza Hut's relationship with C&F as a Pizza Hut Supplier, which encompasses the contractual rights in the [Pizza Hut] Confidentiality Agreement.  The payment Pizza Hut made in exchange for that release, therefore,

represents a gain attributable to the termination of C&F's rights with respect to its trade secrets.

Petitioners' argument ignores the express terms of the settlement agreement, including the following:

>    3.4  The C&F Parties and Pizza Hut acknowledge that the payment called for by this Agreement is being made to compromise and settle claims disputed as to both liability and amount, and is being made to C&F in settlement and release of all past, present and/or future claims against any of the Pizza Hut Released Parties. * * *

>    3.5  The C&F Parties and Pizza Hut acknowledge that this Agreement is intended to terminate any claims by them against the Released Parties and to bar any future litigation between the parties hereto and that there is no agreement by Pizza Hut to make any payment or to do any act or thing other than as expressly stated herein.

On the record before us, we find that petitioners have failed to carry their burden of establishing that Pizza Hut paid the amount at issue under the settlement agreement for the termination of the rights of C&F under the Pizza Hut confidentiality agreement with respect to the C&F trade secret. On that record, we find that petitioners have failed to carry their burden of establishing that under section 1234A the amount at issue is long-term capital gain to C&F for taxable year 2002.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that the amount at issue is long-term capital gain to C&F for taxable year 2002. On that record, we sustain respon-

dent's flow-through determinations in the 2002 notices issued to the respective petitioners that are at issue in these cases.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concession by respondent,

<u>Decisions will be entered under Rule 155</u>.